1   MARC FEINSTEIN (S.B. #158901)
    mfeinstein@omm.com
2   IVANA CINGEL (S.B. #245978)
    icingel@omm.com
3   O'MELVENY & MYERS LLP
    400 South Hope Street, 18th Floor
4   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6000
5   Facsimile: (213) 430-6407

6   STEVEN L. SMITH (S.B. #109942)
    ssmith@omm.com
7   BENJAMIN JONES (S.B. #274409)
    bjones@omm.com
8   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
9   San Francisco, CA 94111-3823
    Telephone: (415) 984-8700
10  Facsimile: (415) 984-8701

11  Attorneys for Plaintiff
    Mgame Corporation

12

13                  UNITED STATES DISTRICT COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15                        SOUTHERN DIVISION

16  MGAME CORPORATION, a Korean        Case No. CV12 - 02525 DSF (JPRx)
    Corporation,
17                                     **VERIFIED COMPLAINT**
                   Plaintiff,
18                                     1. **Conversion**
         v.                            2. **Copyright Infringement**
19                                     3. **Trademark Infringement**
    K2 NETWORK, INC., a California      4. **Computer Fraud & Abuse Act**
20  Corporation,                       5. **Breach of Contract**

21                 Defendant.          Hearing Date:

22                                     Time:

23                                     Place:

24                                     Judge:

25

26

27

28

                                                          VERIFIED COMPLAINT

## INTRODUCTION

1.      Plaintiff Mgame Corporation ("Mgame"), the co-creator and owner of a popular online game with several million users, Knight Online ("KOL" or "Game"), files this Verified Complaint against its former licensee, K2 Network, Inc. ("K2" or "K2N"), to enjoin K2 from continuing to control, operate, distribute and profit from the Game without authorization and to require K2 to return servers, software and data it misappropriated from Mgame.

2.      Beginning in 2003, K2 operated and distributed the Game under a written license from Mgame.  On February 23, 2012, Mgame terminated the license due to K2's failure to pay royalties.  In anticipation of the termination,  K2 preemptively launched an illicit taking of Mgame's Game-related property:  K2 entered Mgame's locked server cage at a shared data facility without authorization, cut off Mgame's access to the Game, trespassed on Mgame's servers housing the Game's user and billing databases, misappropriated the data residing on those databases, and changed Mgame's server passwords to further block its access to its own servers and Game data.  K2's activities are captured on video surveillance footage and confirmed by a technical expert's forensic analysis of Mgame's servers.

3.      Without any authorization, K2 then continued to operate and distribute the Game and to collect revenues from the Game without remitting any royalties to Mgame.  Despite Mgame's demands, K2 has also failed to return several dozen computer servers owned by Mgame that it had permitted K2 to hold as licensee to support the operation and distribution of the Game.  Instead, K2 has converted that property for its own use in continuing to operate and distribute the Game illegally.

4.      K2's intrusion into the Game servers caused a "blackout" of several days during which players could not access the Game.  After players complained, K2 offered in-Game benefits that allowed players to advance their Game character's abilities at a steep discount.  This has the doubly-harmful effect of reducing potential revenues from the Game, as well as adversely altering the rules

VERIFIED COMPLAINT

1  of the Game on which its enduring success has been based.

2       5.     K2's illegal operation and distribution of Knight Online has caused

3  and will continue to cause Mgame substantial, irreparable harm in the form of

4  consumer confusion and loss of control of its reputation, degradation of the Game's

5  security and quality standards, and loss of customer goodwill.  Customer goodwill

6  and game security are essential to the ongoing success of an online game, and loss

7  of either one could result in significant and irreversible harm to the Game.

8       6.     Therefore, in light of the urgency of the circumstances and irreparable

9  harm that Mgame has suffered and will suffer, Mgame requests that this Court

10  restrain and enjoin K2 from continuing to operate, promote, publish, produce,

11  distribute and service the Game; order K2 to immediately transfer the Game

12  Servers and the Billing and User Databases to Mgame, including up-to-date billing

13  and user data; order K2 to provide Mgame with up-to-date sales information; and

14  order K2 to take any further steps necessary to transfer control of the Game to

15  Mgame without disruption in its availability and continuity.

16  **PARTIES, JURISDICTION AND VENUE**

17       7.     Plaintiff Mgame is a corporation organized and existing under the laws

18  of the Republic of Korea, with its principal place of business in Seoul, Republic of

19  Korea.

20       8.     Defendant K2 is a corporation organized and existing under the laws

21  of the state of California with its principal place of business in Irvine, California.

22       9.     This Court has subject matter jurisdiction pursuant to 9.U.S.C. §§ 202

23  and 203, as this action falls under the Convention on the Recognition and

24  Enforcement of Foreign Arbitral Awards (the "Convention"), as well as under the

25  Convention itself, 21 U.S.T. 2517.  As expressly provided by 9 U.S.C. § 203, "[a]n

26  action or proceeding falling under the Convention shall be deemed to arise under

27  the laws and treaties of the United States," and the "district courts of the United

28  States… shall have original jurisdiction over such an action or proceeding,

VERIFIED COMPLAINT

1    regardless of the amount in controversy."

2         10.    Additionally, this Court has subject matter jurisdiction pursuant to 28

3  U.S.C. §§ 1331 and 1338, 15 U.S.C. § 1125(1)(a), and 18 U.S.C. § 1030(g), as this

4  action arises under the Copyright Act, 17 U.S.C. § 101 et seq., the Lanham Act, 15

5  U.S.C. § 1051 et seq., and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

6  The court has supplemental jurisdiction over the remaining claims pursuant 28

7  U.S.C. § 1367.

8         11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)

9  because K2, the only defendant in this matter, resides in this district.

10                                **BACKGROUND**

11        12.    Knight Online is a 3-D multiplayer, online, role-playing game in

12 which players interact with one another within a virtual world set in medieval

13 times.  Knight Online was co-developed by Noah Systems and Mgame, and is

14 owned and internationally distributed by Mgame.

15        13.    While Knight Online is free to play, the Game includes certain

16 premium features that users must pay to access.  These premium features include

17 the ability to obtain priority log-in through a premium "fast-track" channel, and to

18 participate in various events taking place within the Game.  Knight Online also has

19 an in-game "PowerUp Shop," which contains various premium items that players

20 can purchase to enhance their gaming experience and the likelihood of advancing

21 within the Game.  The Game offers paying players four types of premium packages,

22 each of which includes built-in premium features and a certain amount of "game

23 currency" to be used at the PowerUp Shop.

24        14.    Users can purchase premium packages and items in the PowerUp Shop

25 directly through a credit card or through a credit-card-based, online payment system

26 such as PayPal or ClickandBuy.  Users can also purchase premium packages and

27 items in the PowerUp Shop by first purchasing an Electronic Pin Number ("EPIN")

28 from a reseller, such as an internet cafe.  An EPIN is occasionally referred to as an

Electronic Serial Number ("ESN"), while credit-card-based payments are occasionally referred to as non-EPIN payments.

15.     The Game software is continually updated and evolving.  Mgame regularly works on improving the Game by developing software that enhances the players' experience through new challenges, tools, or unique "events" taking place within the Game.  Mgame also continually develops patches that correct various glitches that players identify in the Game.

16.     An online game like Knight Online is also in constant danger of unauthorized use, copying and damage through hacking or viruses.  Knight Online's software thus includes a number of security features designed to protect the Game.  One such feature are the periodic "client" and "server" patches Mgame routinely provided to K2 aimed at enhancing the security of the Game.  Another such feature is a required periodic patch containing a time stamp designed to extend the life of the game.  This patch, known as an "Ebenezer file," must be inserted into the Game's source code in order for the Game to continue operating past a certain date.  Mgame generated Ebenezer files on a regular basis and provided them to K2.  Additionally, Mgame provided K2 with a proprietary anti-hacking software program known as APR.

17.     The Knight Online software is housed on dozens of Game Servers and made operational through the interaction of the Game Servers with databases containing user information, including a user account database ("User Database") and a user billing database ("Billing Database").  The User Database contains all relevant end-user information (players' account names, passwords, dates of birth, registration status, country codes, premium status and history), as well as a game database containing players' "character" information.  The Billing Database contains players' purchase and payment history and partial billing information.  The data in the User Database and the Billing Database are constantly evolving to reflect the current status of play.  For the Game to operate, the Game Servers must

1    communicate with those databases.

2         18.    The Game Servers, the User Database, and the Billing Database for

3    Knight Online are located in Irvine, California, at a high-density data center

4    operated by Latisys-Irvine LLC ("Latisys").  Latisys rents space within its data

5    center in the form of assigned, combination-protected "cages" or "cabinets" that

6    house racks filled with customers' servers.

7         19.    In 2011, Mgame purchased the Game Servers, the User Database, and

8    the Billing Database, including the server hardware and data contained therein,

9    from K2 in exchange for a payment of $150,000.00.  Mgame accordingly owns the

10    Game Servers, the User Database and the Billing Database.  The parties also agreed

11    that K2 could thereafter access the hardware only with Mgame's prior written

12    consent and only for the purposes of operating the Game.

13         20.    As part of this transaction, K2 was required to segregate the hardware

14    for the Knight Online Game Servers, User Database, and Billing Database from the

15    hardware it uses to operate other games, and to physically transfer the former

16    hardware from K2's cage to Mgame's cage at Latisys.  While K2 transferred the

17    hardware needed for the User Database and the Billing Database to Mgame's cage,

18    it retained the Game Servers in its cage with Mgame's consent because K2 had

19    already rented the needed space.  The hardware for the User Database and the

20    Billing Database (the "User and Billing Servers") thus currently resides in Mgame's

21    cage at Latisys, while the hardware for the Game Servers resides in K2's cage.

22    Following the hardware transfer, Mgame reset the administrative passwords for the

23    servers, designated itself as the sole administrator of the servers, and did not share

24    its administrative passwords with K2.  As a result of this change, K2 did not have

25    access to the consols in Mgame's server cage.

26         **THE PARTIES' CONTRACTUAL RELATIONSHIP**

27    **I.    The Exclusive Game Distribution and License Agreement**

28         21.    On November 7, 2003, Mgame and K2 entered into an Exclusive

Game Distribution and License Agreement ("License Agreement") for the exploitation of Knight Online.  A true and correct copy of the License Agreement is attached hereto as Exhibit 1.

22.   Under the License Agreement, Mgame granted K2 the exclusive right to operate, promote, publish, produce, distribute, and service the Game in the United States and Canada for the period from November 7, 2003 through November 6, 2005.  In exchange, K2 agreed to pay an advance license fee and ongoing royalties to Mgame and to fulfill a series of other contractual obligations. (License Agreement Art. 5.)

23.   The term of the License Agreement was subsequently extended through additional agreements executed periodically beginning in 2005 ("Extension Agreements").  True and correct copies of each Extension Agreement are attached hereto as Exhibits 2-7.  Each succeeding Extension Agreement prevails over the License Agreement and the earlier Extension Agreements to the extent its terms are inconsistent with those of the prior Agreements.

24.   Several provisions of the License Agreement protect Mgame's intellectual property in the Game, including the following:

> K2N warrants that its employees shall observe all the intellectual property restrictions.  This includes K2N's obligation, with reasonable efforts, to supervise its employees from disassembling, modifying, reverse engineering, or duplicating the Product [i.e., the Game] without a written consent from Mgame.

(License Agreement Art. 5.13.)

> K2N is responsible for protecting the server software and customer database of the Product from illegal hacking, mis-use, misappropriation and piracy.

(License Agreement Art. 5.22.)

25.    The License Agreement also contains provisions enabling Mgame to terminate for K2's breach.  These provisions require Mgame to provide K2 with

VERIFIED COMPLAINT

1   notice of any breach and allow Mgame to terminate the License Agreement and

2   Extension Agreements (collectively, the "parties' Agreements") if K2 does not

3   remedy the breach within 7 days of receiving Mgame's notice. (*Id.* Arts. 13.1,

4   13.2.)

5   **II.    The Parties' Pre-2009 Disagreements Concerning Transparency of**

6   **Royalty Calculations and K2's Provision of Discounts to Resellers**

7         26.    Prior to 2009, disputes between Mgame and K2 centered around two

8   issues:  (1) the calculation of K2's royalty payment to Mgame and whether it

9   should include the retail value of EPINs given free to EPIN resellers as a form of

10   discount; and (2) the lack of transparency in K2's gross revenue and related royalty

11   calculations.

12         27.    Specifically, K2 routinely provided EPIN resellers with discounts in

13   the form of free EPINs (also referred to as "bonus EPINs" or "discount EPINs"),

14   the amount of which corresponded to the size of the reseller's EPIN purchase.

15   Mgame believed it was entitled to receive royalties on the retail value of the EPINs

16   sold by K2 without any deduction for the free EPINs K2 provided to EPIN

17   resellers.  K2 also routinely provided Mgame with royalty statements that indicated

18   only the total revenues obtained by K2 for EPIN sales and from credit-card-based

19   vendors.  Mgame repeatedly raised concerns regarding lack of revenue transparency

20   related to EPIN sales and requested that K2 provide Mgame with more detailed

21   revenue statements.

22         28.    Following extensive negotiations and using as leverage K2's request

23   that its license territory be expanded to include Turkey, Mgame obtained

24   contractual concessions that addressed both of these issues.  Specifically, the parties

25   agreed to resolve Mgame's discounting-related concerns through the June 4, 2009

26   Game License Extension Agreement ("2009 Extension Agreement") and to address

27   Mgame's transparency-related concerns by entering into the June 8, 2009 Operating

28   Agreement ("Operating Agreement") that created an Mgame-controlled entity,

7                                    VERIFIED COMPLAINT

Game Café Services, LLC ("GCS"), that would serve as an intermediary between K2 and EPIN resellers in Turkey.  A true and correct copy of the Operating Agreement is attached hereto as Exhibit 8.

**A.    The 2009 Game License Extension Agreement**

29.    The 2009 Extension Agreement extended the term of K2's license, expanded the territory covered by the license to include Turkey, and amended the gross revenue and royalty calculation provisions set forth in the prior Agreements. Specifically, the 2009 Extension Agreement established a new method of calculating Gross Revenue and set the royalty rate at 40%, 35%, or 30% depending on the amount of Gross Revenue received through EPIN and non-EPIN sales.

30.    The 2009 Extension Agreement addressed Mgame's demands that it receive royalties on EPINs that K2 chose to provide to resellers free of charge (as a "discount") by making clear that Gross Revenue was to be calculated without deducting such discounts.  Article 6(i)–(ii) provided:

> Gross Revenues from EPIN
>
> Licensee shall pay monthly Revenue Sharing to Licensor the 40%, 35% and 30% of Gross Revenues on The [2009] Extension Agreement basis *without deducting any* sales costs, channel costs, marketing costs, *discount costs in Turkey and other countries* and any related costs including but not limited to business tax, operation tax, value added tax and sales tax of EPIN.
>
> Gross Revenues from all []other billing methods beside EPIN.
>
> Licensee shall pay monthly Revenue Sharing to Licensor the 40%, 35% and 30% on the third extension agreement basis after total 10% (including but not limited to any sales costs, channel costs, marketing costs, business tax, operation tax, value added tax) deduct[ion] only.

(2009 Extension Agreement Art. 6 (emphasis added).)

**B.    The Game Cafe Services Operating Agreement**

31.    The Operating Agreement, in turn, created a company, GCS, which would serve as an intermediary for payments between K2 and EPIN resellers in Turkey, the largest Knight Online market.  Mgame served as one of the members of

1   GCS and initially held a controlling interest in the company.  Under the Operating

2   Agreement, K2 and Mgame granted GCS the exclusive right to market, sell, and

3   distribute EPINs in Turkey, and made it "solely responsible for the sale and

4   distribution of [EPIN]s for Game throughout the Territory, including collecting all

5   revenue from customers for the sale of such [EPIN]s."  (Operating Agreement Arts.

6   12.1–12.2.)

7          32.     In practice, large resellers made payments to GCS in order to purchase

8   EPINs.  As provided in the Operating Agreement, GCS purchased EPINs from K2

9   at a 30% discount off the "stated retail value" of the EPINs to end-users, and would

10  then sell the EPINs to resellers. (Operating Agreement Art. 12.3.)  The EPINs sold

11  by GCS to resellers included not only EPINs purchased by the resellers for the

12  stated retail value but also EPINs provided to resellers for free as a discount.  After

13  receiving payment from GCS, K2 would pay Mgame a royalty.  For EPIN sales

14  through GCS, the royalty was calculated not on the amount paid by GCS to K2, but

15  on the stated retail value of the EPINs without deducting discount for EPINs

16  provided by GCS for free.

17         33.     This arrangement is set out in Article 12.3 of the Operating

18  Agreement, which operates in conjunction with Article 6 of the 2009 Extension

19  Agreement.  Article 12.3 of the Operating Agreement provides that "K2 shall be

20  responsible for paying Mgame its 'revenue share' (based on the total amounts

21  received by K2 from [GCS]) as contemplated by the [2009 Extension Agreement]."

22  As noted above, Article 6 of the 2009 Extension Agreement, in turn, specifically

23  provides that royalties are to be calculated based on Gross Revenues without

24  deducting any discount costs or any other costs, including any EPIN-related costs.

25         34.     In recognition of the amendments made to the calculation of Gross

26  Revenue and related royalties, K2 immediately began paying royalties based on

27  Gross Revenue amounts that included the stated retail value of the "discount"

28  EPINs that GCS provided to K2 for distribution to resellers.  Indeed, from August

1  2009 until its recent payment defaults, K2 consistently paid monthly royalties to

2  Mgame based on K2's own Gross Revenue calculations that included the stated

3  retail value of discount EPINs.

4  **III.   The 2011 Game License Extension Agreement**

5        35.    Additional significant amendments to the License Agreement were

6  made through the October 4, 2011 License Extension Agreement ("2011 Extension

7  Agreement").  The 2011 Extension Agreement extended the term of K2's license

8  until December 3, 2012, and included detailed provisions concerning default and

9  termination of the Agreement.

10       36.    In particular, the 2011 Extension Agreement provided that the parties'

11  Agreements "shall not be terminated prior to the Expiration Date except due to

12  default in accordance with the Agreement and Prior Agreements."  (2011 Extension

13  Agreement Art. 7.)  The 2011 Extension Agreement then identified five instances

14  of default, including "[f]ailure of Licensee to pay monthly royalty payment within

15  15 days after the due date" and "[f]ailure of Licensee to transfer intact all server

16  equipments on Appendix A and User [Database] . . . for all Users of the Product [by

17  June 3, 2012]."  (*Id.* Art. 6(3).)

18       37.    The 2011 Extension Agreement also included detailed provisions

19  concerning the ownership of the Server Equipment and the User Database.  It

20  provided that "upon the commencement of this Agreement and upon [Mgame]

21  making the Equipment Purchase Payment . . . ownership of the KOL server

22  hardware described in Appendix A (Server Equipment) shall be immediately

23  transferred to Licensor," and further provided that the User Database "shall be

24  included with the Server Equipment" and transferred intact "to the same extent that

25  such database exists on such Server Equipment as currently operated by K2."  (*Id.*

26  Arts. 8.1, 8.3. App. A.)  The 2011 Extension Agreement also provided that "[a]fter

27  the Expiration Date or Early Termination Date of this Agreement, [Mgame] can

28  move and relocated Server Equipment outside from the Authorized Data Center."

VERIFIED COMPLAINT

1    (*Id.* Art. 8(5).)

2                    **K2 USURPS MGAME'S KNIGHT ONLINE BUSINESS**

3    **I.    K2 Defaults on Its Obligation to Make Royalty Payments and Mgame
4          Issues a Notice of Default**

5              38.    Under the License Agreement and the Extension Agreements, K2 was

6    to pay royalties to Mgame on a monthly basis.  (2008 and 2009 Extension

7    Agreements Arts. 5–6.)  In practice, K2 provided Mgame with its Gross Revenue

8    report within three weeks of the close of the month and paid royalties no later than

9    the fifteenth day of the following month.

10             39.    On December 17, 2011, K2 sent its November 2011 revenue statement

11   to Mgame, which states that K2 owed Mgame a royalty in the amount of

12   $223,870.38.  A true and correct copy of the November 2011 revenue statement is

13   attached hereto as Exhibit 9.

14             40.    K2, however, failed to make the November 2011 royalty payment by

15   the due date of January 15, 2012.

16             41.    K2 admitted to Mgame in various correspondence that it was in

17   financial distress and experiencing cash flow difficulties.  A true and correct copy

18   of one such correspondence is attached hereto as Exhibit 10.

19             42.    K-2 failed to make the overdue royalty payment in the next 15 days, as

20   required by Article 6(1) of the 2011 Extension Agreement.  On February 2, 2012,

21   Mgame accordingly sent K2 a Notice of Default.  The Notice of Default stated that

22   K2 was in default of its contractual obligation to pay Mgame its monthly royalty

23   within 15 days of its due date.  The Notice also quoted the default provision set

24   forth in Article 6 of the 2011 Extension Agreement, invited K2 to cure the default

25   by February 10, 2012, and notified K2 that, absent such cure, termination would

26   proceed in accordance with Article 7 of the 2011 Extension Agreement.  A true and

27   correct copy of the Notice of Default is attached hereto as Exhibit 11.

28             43.    Despite receiving Mgame's Notice of Default, K2 failed to cure the

1   default by making the outstanding royalty payment to Mgame.  Indeed, K2 has not

2   yet paid the November 2011 royalty, nor the royalties for December 2011 and

3   January 2012.  A true and correct copy of the December 2011 revenue statement is

4   attached hereto as Exhibit 12.

5   **II.   Mgame's Security Measures Reveal That K2 Had Been Reverse
        Engineering Mgame's Knight Online Software**

6

7          44.    After sending K2 the Notice of Default, Mgame took a number of

8   security measures aimed at protecting its ownership interest in the Game and

9   determining whether K2 was reverse engineering the Knight Online software.

10         45.    Specifically, Mgame included in its February 6, 2012 patch a client

11  execution file with a launcher coded so that players logging into the Game would

12  first "ping" K2's server and then "ping" to Mgame's servers.  When integrated into

13  the Game's source code, this launcher would give Mgame the option to redirect

14  players to its own Game website if K2's servers went off line due to K2's failure to

15  cure its default and Mgame's decision to terminate the parties' Agreements.

16  Mgame designed this feature of the launcher to be undetectable to K2 except

17  through contractually prohibited reverse engineering of the patch source code.

18         46.    On February 16, 2012, through an e-mail forwarded to Mgame by a

19  K2 employee, Mgame learned that K2 had in fact reverse engineered the launcher

20  source code and discovered and disassembled its security feature.  A true and

21  correct copy of the February 17, 2012 e-mail is attached hereto as Exhibit 13.

22         47.    On February 23, 2012, Mgame sent K2 a patch that contained a client

23  execution file with an embedded alphanumeric string including a popular song

24  lyric.  Mgame occasionally inserted such alphanumeric strings into its patches

25  because such strings, when integrated into the Game's source code, made it more

26  difficult for hackers to gain access to the Game.  Shortly after receiving the patch,

27  K2 confronted Mgame regarding the song lyric embedded in the patch, further

28  demonstrating that K2 was reverse engineering the client and server patches it

VERIFIED COMPLAINT

received from Mgame.

48.    After Mgame decided to terminate the parties' Agreements, it sent K2 an Ebenezer file that included a one-day time stamp meant to replace the existing time stamp and expire the same day.  K2 again reverse engineered the Ebenezer file, discovered the shortened time stamp, provided Mgame with the disassembled source code, and requested that Mgame provide a new time stamp.

49.    K2's disassembling and reverse engineering of software updates provided by Mgame, including launchers, client and server patches, and Ebenezer files, are a violation of K2's contractual obligation under the License Agreement that it ensure that "its employees . . . observe all the intellectual property restrictions" and its related obligation to "supervise its employees from disassembling, modifying, reverse engineering, or duplicating the Product without a written consent from Mgame."  (License Agreement Art. 5.13.)

### III.   K2 Trespasses on Mgame's Servers, Cuts Off Mgame's Access to the Game, and Misappropriates the User and Billing Databases

50.    Rather than cure its default by paying the outstanding royalty, K2, in anticipation of Mgame's impending termination, directed three individuals, whom Mgame believes to be K2 employees, to trespass on Mgame's servers, cut off Mgame's access to its own Game, and misappropriate the Game's User Database and Billing Database.

51.    Specifically, at 11:03 in the morning of February 22, 2012, K2 employee Matt Gee briefly entered Mgame's cage at Latisys without obtaining Mgame's contractually required pre-authorization.  On information and belief, during his visit, Gee blocked Mgame's remote VPN and IP access to the User and Billing Servers and disabled Mgame's administrative password, thereby effectively terminating Mgame's access to the Game and its ability to monitor K2's activities.

52.    When Mgame noticed that its access was blocked, it requested that K2 reopen the VPN and IP and inquired about the status of its password.  K2 failed to

VERIFIED COMPLAINT

1    reopen the VPN and IP.

2        53.    Having terminated Mgame's access to the Game and its ability to

3    monitor K2's activities, at 7:29 in the evening of February 22, 2012, two other K2

4    employees, Joshua Clausen and Duncan Bowring, entered Mgame's cage at Latisys

5    without obtaining contractually required pre-authorization from Mgame.  After

6    entering the cage, Clausen and Bowring opened the combination-protected cabinets

7    housing the server rack containing Mgame's User and Billing Servers.  They then

8    opened the front and back doors of Mgame's server racks and spent nearly five

9    hours "working" on the User and Billing Servers.  On information and belief, K2

10   used this time to illegally copy proprietary data from Mgame's databases, remove a

11   portable hard disk from Mgame's servers containing a back-up copy of the User

12   Database, and create its own User and Billing Databases to support the Game.

13   Clausen and Bowring left Mgame's cage shortly after midnight in the morning of

14   February 23, 2012.  A true and correct copy of an e-mail from Latisys describing

15   access to Mgame's cabinet on February 22, 2012 as revealed by surveillance

16   footage is attached hereto as Exhibit 14.

17       54.    After being notified by Latisys of activity in its server cage, Mgame

18   sent one of its local branch employees, Hun Kyu Kim, to Latisys to inspect the User

19   and Billing Database servers.  As Hun Kyu Kim reported, the cables connecting the

20   User and Billing Databases to the Game Servers were missing and the lights that

21   normally indicate server activity were not blinking, meaning that Mgame's User

22   and Billing Databases were no longer connected to or transmitting data to the Game

23   Servers.  Additionally, a portable hard disk containing a back-up copy of Mgame's

24   User Database had been detached from Mgame's servers and removed from the

25   server cage.  The servers scheduled to run an hour back-up of the User Database

26   displayed an error message, indicating, upon information and belief, that the

27   portable hard disk was removed shortly before that time.

28       55.    K2's February 23, 2012 disconnection of Mgame's User and Billing

Database servers from the Game Servers caused Knight Online to "go dark."  On information and belief, K2 worked during the outage to connect the replicated User and Billing Databases to the Game Servers and to develop software that would allow K2 to circumvent the need to use Mgame's weekly Ebenezer files.  The Game became available to some users beginning on February 24, 2012, and fully available on February 27, 2012.  On February 24, 2012, K2 acknowledged that the Game had "gone dark" on its website.  A true and correct copy of a screen shot of K2's website is attached hereto as Exhibit 15.

**IV.    Mgame Terminates the License Agreement**

56.    On the basis of K2's failure to pay outstanding royalties, Mgame proceeded to formally terminate K2's license.

57.    In a February 23, 2012 Notice of Material Breach and Termination ("Termination Notice"), Mgame advised K2 that the License Agreement is terminated effective 5:00 p.m. PST on February 23, 2012, and requested that K2 fulfill its obligations related to termination.

58.    The Termination Notice also notified K2 that it was now also in default of its December 2012 royalty payment obligation, and reminded K2 that it had failed to comply with its contractual requirement to transfer the Game Server hardware to Mgame.

59.    The Termination Notice further advised K2 that it had illegally blocked Mgame's VPN and IP connection, and that K2 was responsible for all issues arising from that incident.  A true and correct copy of the Termination Notice is attached hereto as Exhibit 16.

**V.    K2 Sends an Untimely Response to Mgame's Notice of Default and Alleges Material Breaches by Mgame**

60.    On February 23, 2012, Mgame received K2's first, untimely response to Mgame's February 2, 2012 Notice of Default ("Response").  A true and correct copy of the Response is attached hereto as Exhibit 17.

61.     In its Response, K2 asserted that it had recently discovered an error in each of its monthly royalty calculations since August 2009 and that, as a result of this error, K2 had overpaid Mgame's royalty by approximately $2 million.  Relying on this claimed overpayment error, K2 argued that it was not in fact in default of its monthly royalty obligations and that the parties' Agreements therefore remained in full force and effect.

62.     Compounding the obvious inconsistency between K2's royalty payment calculations for two years and its current legal position, K2 then contradicted its argument that the Agreements remained in effect by asserting that it now owned Mgame's servers because Mgame had in fact terminated the Agreements, but had done so prior to the contractual expiration date without making an early termination payment.  According to K2, Mgame's early termination without that payment entitled K2 to take ownership of the Servers under Article 7(2) of the 2011 Extension Agreement.  K2 further contended that Mgame had materially breached the parties' Agreements by terminating them prior to their expiration and by failing to provide K2 with weekly time-stamp files needed to keep the game operational.  K2 also alleged that Mgame had provided K2 with a corrupt launcher and corrupt Ebenezer files.

63.     K2's Response made no mention of the fact that, only the day before, three K2 employees had trespassed on Mgame's cabinet, blocked Mgame's access to its own Game, improperly copied data from the User and Billing Databases, and caused the Game to go dark.  Instead, exacerbating K2's already egregious misconduct, the Response warned Mgame not to take any action to interfere with K2's purported right to operate and distribute the Game.

64.     Importantly, the February 23, 2012 Response implicitly acknowledged that K2 had been reverse engineering Mgame's software, as it identifies the characteristics of the launcher source code and the Ebenezer file that Mgame designed to be undiscoverable except through reverse engineering.  Specifically, the

VERIFIED COMPLAINT

Response admits that K2 detected the alphanumeric string in the starting procedure of the February 23, 2012 Ebenezer file, and also admits, albeit inaccurately, that the February 15, 2012 launcher source code "was coded by Mgame in a way that all of K2's users would first ping Mgame's server without direct authorization and then ping back to K2's servers."  K2 could not have discovered these features except through reverse engineering.

65.    Finally, the Response indicated that K2 had no intention to make the royalty payments that were past due or, indeed, any further royalty payments, and instead had every intention to continue operating the Game and Mgame's Knight Online business without Mgame's involvement.

## VI.    Mgame Confirms the Termination of the License Agreement and Demands That K2 Cease Illegal Operation of the Game

66.    Mgame sent K2 another letter on February 28, 2012, confirming that the Parties' Agreements were terminated and demanding that K2 take the necessary steps to transfer control and operation of the Game to Mgame.  A true and correct copy of this letter is attached hereto as Exhibit 18.

67.    Specifically, Mgame demanded that K2 immediately, among other things: (1) cease all operation of the KOL game; (2) stop selling EPIN codes; (3) stop operating the Web Power Up Store and selling items from the Store; (4) remove all KOL- and Mgame-related images, trademarks, and logos from its website and all online and offline locations; (5) stop reverse engineering the KOL game client and server software source code; (6) provide notice to various business partners about K2's obligations upon termination of the parties' Agreements; and (7) return the Game Servers and the Billing and User Databases to Mgame and transfer the Game Servers to Mgame's server cage.

68.    K2 has nevertheless continued without authorization to operate the Game and collect revenue using Mgame's Game Servers and K2's illegal copies of Mgame's User and Billing Databases.  Indeed, on March 2, 2012, K2 sent Mgame a

1  letter reasserting that, due to K2's purported royalty overpayment, K2 was not in

2  breach of its obligation to pay royalties and the parties' Agreements were

3  accordingly "in full force and effect, including K2's exclusive rights to continue to

4  operate the Game in the Territory through December 3, 2012."

5       69.    In a reprise of the contradictory position it had taken in its

6  February 23, 2012 letter, K2 also refused to return Mgame's Game Servers on the

7  ground that K2 now owned them because Mgame had, in fact, terminated the

8  Agreements without making the contractually-required early termination payment.

9  True and correct copies of this letter and its enclosures is attached hereto as

10  Exhibits 19-20.

11       70.    On March 15, 2012, Mgame sent a letter to K2 and its legal counsel

12  demonstrating why K2's belated overpayment claim was without merit and legally

13  irrelevant, confirming once again the termination of the parties' Agreements, and

14  demanding that K2 cease its distribution and operation of the Game and its

15  misappropriation of Mgame's property for that purpose.  A true and correct copy of

16  this letter is attached hereto as Exhibit 21.

17       71.    Regarding K2's overpayment claim, Mgame's letter explained that,

18  under Article 6 of the 2009 Extension Agreement, Mgame's monthly royalties were

19  to be calculated without deducting any discount costs, which would include the

20  value of bonus or discount EPINs.  The letter pointed out that K2 itself had

21  calculated the royalties in this manner for over two years and that it raised its

22  overpayment claim only after receiving Mgame's notice of default and intent to

23  terminate.  Mgame's letter went on to state that, even if K2 had a colorable basis to

24  assert its entitlement to a refund for the alleged overpayments, K2 was still not

25  excused from meeting its ongoing obligation to pay monthly royalties.  Finally,

26  Mgame's letter explained that K2's overpayment claim was, in any event,

27  irrelevant, as Mgame possessed an absolute right of termination, with or without

28  cause, under Article 7.2 of the 2011 Extension Agreement.  (2011 Extension

VERIFIED COMPLAINT

1   Agreement Art. 7.2.)  Indeed, K2's own letters of February 24 and March 2

2   expressly acknowledged that the parties' Agreements had been terminated on this

3   basis.

4        72.   Because the parties' Agreements have been properly terminated,

5   Mgame reasserted the demands made in its previous letters.  K2 has failed to

6   respond and, to this day, continues its illegal operation and distribution of the

7   Game.

8   **VII.  Mgame's Forensic Consultants Confirm That K2 Copied the User and
        Billing Databases**

9

10       73.   On or about March 8, 2012, O'Melveny & Myers LLP retained Stroz

11  Friedberg on behalf of Mgame to provide technical and consulting services in

12  connection with an investigation of Mgame's User and Billing Database Servers.

13  By correlating the video surveillance and physical access logs provided by Latisys

14  with the digital forensic evidence found on the Mgame servers, Stroz Friedberg

15  confirmed that, on February 22 and 23, 2012, three K2 employees (1) wiped

16  passwords on the Mgame servers; (2) further modified them to facilitate K2's

17  access while locking Mgame out of the servers; and (3) copied or otherwise

18  transferred game-specific databases to devices controlled by K2.  Stroz Friedberg

19  has submitted a declaration in support of this Verified Complaint.

20  **VIII.  Irreparable Harm to Mgame**

21       74.   K2's unauthorized operation of the Game has already caused Mgame

22  to suffer irreparable harm, for several reasons.  First, K2's modification of the

23  Game's source code and its unauthorized operation of the Game have greatly

24  increased the vulnerability of the Game to intrusion by hackers and other security

25  risks.  One of the key services that Mgame provided during the operation of the

26  parties' Agreements was access to Mgame's security software program known as

27  APR, which was highly effective at preventing intrusion by hackers.  Mgame began

28  to provide this software in 2008, in response to K2's inability to effectively prevent

intrusion by hackers through its use of the expensive, yet technically inadequate, X-trap software program.  Mgame frequently updated the APR software through software patches in order to maintain the APR software's ability to protect against new security threats.  Although K2 continues to operate the APR software, it no longer receives APR patches from Mgame. Without continual updates, the APR software will cease to provide effective protection, and will increase the vulnerability of the Game to security threats.  Consequently, K2's unauthorized operation of the game increases the likelihood that hackers will intrude in the Game, exploit security vulnerabilities to gain an unfair advantage in the game, and potentially gain access to the Game's source code and the underlying personal and financial information stored in the User and Billing databases.

75.   K2 has also begun to degrade the quality standards of the Game, distributing discounted premium packages and free items and other perks to Game users and altering the Game's rules, as demonstrated by postings made by K2 on its website.  A true and correct copy of a screen shot taken of one of those postings is attached hereto as Exhibit 22, as well as Exhibit 15.  K2 also appears to have experienced technical difficulties with the servers that caused the Game to "go dark" again in early March.  A true and correct copy of a screen shot taken of K2's Facebook page discussing K2s attempts to remedy these difficulties is attached hereto as Exhibit 23.

76.   Although the Game exists in a market crowded with many competitors, it has enjoyed worldwide success as a consequence of its well-balanced, carefully-designed rules of play.  K2's unauthorized modifications to the Game's rules will likely do harm to this careful balance, resulting in user dissatisfaction and attrition.  K2 recently posted a Post Maintenance Update on its website on March 16, 2012, notifying users that it had changed the rules of the Game.  A true and correct copy of the Post Maintenance Update notice is attached hereto as Exhibit 24.

VERIFIED COMPLAINT

77.     Another important element of the Game's success is the customer goodwill Mgame has generated over time.  Customer goodwill is a product of many factors, including the quality and design of the Game, the quality of service provided by the Game's developer, and the timing of its entry into a particular market.  Once lost, however, customer goodwill is extremely difficult to regain.  Game users are capable of switching from one game to another in short order, and former users are unlikely to return.

78.     As a result of this commercial reality, K2's unauthorized operation of the Game has already caused significant irreparable harm to Mgame.  First, K2 made the Game "go dark" for several days in late February, causing an outcry from Game users in North America and Turkey, with many users expressing their discontent and frustration in online forums.  Mgame is unable to quantify the loss of customer goodwill associated with that period of unavailability, in part because K2 has blocked its access to the User and Billing Databases.  Mgame expects, however, that the Game has already experienced user attrition due to the prolonged period of unavailability.  Mgame expects further losses of customer goodwill will arise from K2's degradation of the Game's security and quality standards.  A true and correct copy of two sample customer complaints dealing with server outages are attached hereto as Exhibit 25.

79.     Finally, K2's unauthorized post-termination operation of the Game has resulted in consumer confusion and Mgame's loss of control over its reputation.  Game users and resellers have continued to transact with K2, partly due to K2's baseless representations that it has authorization to continue operating the Game, as demonstrated by an email from a K2 executive to a mailing list of Turkish resellers.  (*See* three e-mails at the beginning of the e-mail chain in Exhibit 12).

80.     As Mgame is no longer able to monitor K2's operation of the Game, it has lost control of its reputation, and any damage to the Game or its users arising from K2's conduct may be wrongfully attributed to Mgame.

**IX.    Arbitration**

81.    The 2009 Extension Agreement provides that disputes between Mgame and K2 will be resolved through binding arbitration in Singapore in accordance with the 1976 UNCITRAL Arbitration Rules.  (2009 Extension Agreement Art. 8.)  A true and correct copy of the 1976 UNCITRAL Arbitration Rules is attached hereto as Exhibit 26.   Mgame is in the process of initiating arbitration in accordance with Article 8 of the 2009 Extension Agreement. However, Mgame is in need of immediate relief to protect its rights and avoid irreparable harm, and this Court is authorized by law to provide such relief pending the outcome of the arbitration.

**X.    Causes of Action**

82.    Mgame asserts the following causes of action in support of its request for a temporary restraining order and preliminary injunctive relief in aid of arbitration.  To avoid irreparable harm and preserve the meaningfulness of the arbitration process, this Court is empowered to issue interim injunctive relief. *Toyo Tire Holdings of Am., Inc. v. Cont'l Tire of N. Am.*, 609 F.3d 975, 978-81 (9th Cir. 2010).

**COUNT I**

**Conversion**

83.    Mgame realleges the allegations set forth in paragraphs 1 - 82 as though fully set forth below.

84.    Mgame possesses valuable property rights in its Game Servers as well as the User and Billing Servers and their contents, including the User and Billing Databases.  These property rights include Mgame's exclusive ownership and control of the Game Servers and the User and Billing Servers, and its ability to control K2's access to such servers and their contents.

VERIFIED COMPLAINT

1    85.    K2 has engaged in a naked taking of Mgame's property without any

2    basis in the parties' Agreements or in law.  It has also cut off Mgame's access to its

3    own game and has deprived Mgame of its rights of exclusive ownership and control

4    of its servers and their contents.

5    86.    As a result of K2's continuing conversion of Mgame's valuable

6    property in violation of Mgame's rights therein, Mgame has suffered and continues

7    to suffer harm.

8                                    **COUNT II**

9                            **Copyright Infringement**

10    87.    Mgame realleges the allegations set forth in paragraphs 1-86 as

11    though fully set forth below.

12    88.    Mgame has registered its copyright in the Game software in the

13    Republic of Korea.  Pursuant to the copyright, Mgame possesses exclusive statutory

14    rights, including the rights to reproduce and distribute the Game software and to

15    produce derivative works of its copyrighted work.

16    89.    Following Mgame's termination of the parties' Agreements, K2 has

17    infringed Mgame's copyright by reproducing the Game software, including by

18    recently adding another Game server, and by distributing it to Game users for

19    profit.  K2 has also produced an infringing derivative work of Mgame's

20    copyrighted work by reverse engineering and modifying the Game to no longer

21    require time-stamp files, and by altering the rules of the Game.

22    90.    As a result of K2's continuing infringement of Mgame's copyright in

23    the Game software, Mgame has suffered and continues to suffer harm.

24                                   **COUNT III**

25                          **False Designation of Origin**

26    91.    Mgame realleges the allegations set forth in paragraphs 1- 90 as

27    though fully set forth below.

28    92.    Mgame owns the trademark KNIGHT ONLINE for computer games in

                                        23                    VERIFIED COMPLAINT

the United States.

93.     K2 was licensed to use the mark KNIGHT ONLINE under the License Agreement.  After termination of the License Agreement, K2 has continued its unauthorized use of the mark KNIGHT ONLINE in conjunction with its unauthorized operation and distribution of the Game.  K2's continuing use of the mark in connection with the Game is likely to cause confusion or mistake as to the origin, sponsorship or association of the Game in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(1)(a).

94.     K2 has acted willfully, with the intent to trade upon the goodwill and reputation of Mgame and the Game, and with the intent to cause confusion, to cause mistake or to deceive.

95.     As a result of K2's acts, Mgame has suffered and continues to suffer irreparable harm.

## COUNT IV

## Computer Fraud & Abuse Act

96.     Mgame realleges the allegations set forth in paragraphs 1-96 as though fully set forth below.

97.     Mgame protected its servers by placing them in a secured facility, designating itself as the sole administrative user, changing the administrative password, and denying K2 from accessing its servers without prior written consent.

98.     K2 intentionally accessed and used Mgame's servers without unauthorized in violation of 18 U.S.C. § 1030.

99.     As a result of K2's unlawful access and use of Mgame's servers, Mgame has suffered daily damages substantially greater than $25,000 and will continue to suffer harm.

## COUNT V

## Breach of Contract

100.   Mgame realleges the allegations set forth in paragraphs 1-100 as

1    though fully set forth below.

2          101.   Mgame has performed its obligations under the parties' Agreements.

3          102.   Under the parties' Agreements, K2 had a clear, independent

4    contractual obligation to make monthly royalty payments to Mgame.

5          103.    K2 breached its obligations under the parties' Agreements by failing

6    to pay royalties to Mgame, and is also in breach of its post-termination obligation to

7    cease distributing and operating the Game.

8          104.   As a result of K2's breaches of the parties' Agreements, including its

9    ongoing breaches of its post-termination obligation to cease distributing and

10   operating the Game, Mgame has suffered and continues to suffer harm.

11

12         **WHEREFORE**, Mgame respectfully requests that this Court:

13         105.   A.      Issue a Temporary Restraining Order and Preliminary Injunction

14   pursuant to Fed. R. Civ. P. 65 until an arbitral tribunal issues an award determining

15   the respective rights and obligations of Mgame and K2 with respect to the disputes

16   set forth herein

17         (1) restraining and enjoining K2, including its members, agents, employees,

18         and all persons and organizations acting by, in concert with, through or under

19         them, or by and through their orders from:

20              (A) continuing to operate, promote, publish, produce, distribute,

21              service, and sell access to or collect revenues from the Game;

22              (B) using, disassembling, reverse engineering, duplicating, or

23              transmitting to third parties any Game-related software and data,

24              including software and data contained on the Game Servers and

25              Billing and User Databases, any copy thereof, or any data derived

26              therefrom;

27              (C) using any Game- or Mgame-related trademarks, images, and logos;

28         (2)    requiring K2 to immediately return the Game Servers and the Billing

                                          25                    VERIFIED COMPLAINT

and User Databases to Mgame, including up-to-date user and billing data;

(3)     requiring K2 to immediately provide Mgame with up-to-date sales information, including the information on EPIN codes that K2 sold to resellers; and

(4)     requiring K2 to immediately take any other steps necessary to transfer control of the Game to Mgame without disruption in accessibility and continuity from the Game users' perspective.

106.   B.     Award Mgame such other and further relief as this Court may deem just and proper.


Dated:  March 23, 2012

Respectfully submitted:

MARC FEINSTEIN
IVANA CINGEL
O'MELVENY & MYERS LLP

By: _____
         Marc Feinstein
Attorneys for Plaintiff Mgame
Corporation

1                                     **VERIFICATION**

2         I declare under penalties of perjury under the laws of the United States, as

3 provided by 28 U.S.C. § 1746, that I have read the foregoing statement and that the

4 facts stated in it are true and correct.

5

6 Dated: March 23, 2012                          By:

7                                              Seunghun Choi
                                             Director of International Business
                                             Department

8

9                                              Mgame Corporation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        VERIFIED COMPLAINT