1   STEPHEN S. SMITH (SBN 166539)
    SSmith@GreenbergGlusker.com
2   JULIA R. HAYE (SBN 198138)
    JHaye@GreenbergGlusker.com
3   DAN D. NABEL (SBN 266320)
    DNabel@GreenbergGlusker.com
4   GREENBERG GLUSKER FIELDS CLAMAN
    & MACHTINGER LLP
5   1900 Avenue of the Stars, 21st Floor
    Los Angeles, California  90067-4590
6   Telephone:  310.553.3610
    Fax:  310.553.0687
7

8   Attorneys for Defendant
    K2 Network, Inc., a California corporation

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13   MGAME CORPORATION, a         Case No.  CV12-02525 JST (ANx)
    corporation organized under the laws of
the Republic of Korea,          **K2 NETWORK, INC.'S OPPOSITION**
14                         **TO MGAME'S APPLICATION FOR**
          Plaintiff,           **PRELIMINARY INJUNCTION**
15
    v.
16                       **Hearing:**
    K2 NETWORK, INC., a California     Date:  April 30, 2012
17   corporation,                 Time:  10:00 a.m.
                           Courtroom:  10-A
18           Defendant.

19                         Action Filing Date:  March 23, 2012

20

21

22

23

24

25

26

27

28

            GREENBERG GLUSKER FIELDS CLAMAN
               & MACHTINGER LLP
          1900 Avenue of the Stars, 21st Floor
          Los Angeles, California 90067-4590

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................... 3

      A.    Factual Background and the Parties' Agreements ......................... 3

      B.    The Revenue Sharing Dispute ...................................................... 4

      C.    Mgame's Failure to Provide Adequate Technical Support ................ 6

      D.    Mgame Wrongfully Interfered With K2's Ability to Operate the
            Game Even Before Mgame Wrongfully Repudiated the
            Agreement .................................................................................... 6

            1.    Poison Pill #1 ...................................................................... 7

            2.    Poison Pill #2 ...................................................................... 7

            3.    Response to Poison Pill #2; K2's Actions to Preserve the
                  Game ................................................................................... 8

            4.    K2's Game-Rescue Operations ............................................ 8

            5.    Poison Pills #3 and #4 ...................................................... 10

      E.    The Status Quo .......................................................................... 11

III.  ARGUMENT ...................................................................................... 11

      A.    This Court Is Not Empowered To Issue The Relief That Mgame
            Seeks ......................................................................................... 11

            1.    The Applicable Arbitration Rules Do Not "Authorize" a
                  Judicial Authority to Issue Interim Relief .......................... 11

            2.    Simula Prohibits Consideration of Mgame's Request ............. 13

            3.    Mgame's Request Also Violates the Holding in Toyo ........... 15

      B.    Mgame Cannot Meet The Requirements For Issuance Of A
            Preliminary Injunction ............................................................... 18

            1.    Mgame Cannot Establish A Likelihood Of Success On
                  The Merits ......................................................................... 18

            2.    MGame Cannot Establish a Likelihood of Irreparable
                  Harm .................................................................................. 22

            3.    The Balance Of Equities Tips In K2's Favor ...................... 24

            4.    Injunctive Relief Is Not In The Public Interest .................. 25

      C.    Mgame Has Failed to Tender a Bond ......................................... 25

IV.   CONCLUSION .................................................................................... 25

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

# TABLE OF CASES AND AUTHORITIES

Page(s)

**CASES**

*Caribbean Marine Serv. Co. v. Baldridge,*
844 F.2d 668 (9th Cir. 1988)................................................................17

*China National Metal Products Import/Export Co. v. Apex Digital, Inc.,*
155 F.Supp.2d 1174 (C.D.Cal. 2001)..........................................13, 14

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,*
654 F.3d 989 (9th Cir. 2011)...............................................................23

*Goto.com, Inc. Walt Disney Co.,*
202 F.3d 1199 (9th Cir. 2000)........................................................2, 15

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters,*
415 U.S. 423 (1974) .............................................................................17

*Leigh v. Salazar,*
668 F.3d 1126 (9th Cir. 2012).............................................................18

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.,*
887 F.Supp. 1320 (N.D.Cal. 1995) .....................................................18

*Los Angeles Memorial Coliseum Comm'n v. NFL,*
634 F.2d 1197 (9th Cir. 1980).............................................................22

*MDY Industries, LLC v. Blizzard Entertainment, Inc.,*
629 F.3d 928 (9th Cir. 2010)...............................................................21

*Perfect 10, Inc. v. Google, Inc.,*
653 F.3d 976 (9th Cir. 2011)...............................................................23

*Reno Air Racing Ass'n., Inc. v. McCord,*
452 F.3d 1126 (9th Cir. 2006).............................................................17

*Simula, Inc. v. Autoliv, Inc.,*
175 F.3d 716 (9th Cir. 1999).....................................................in passim

*Toyo Tire Holdings of America, Inc. v. Continental Tire of North America,*
609 F.3d 975 (9th Cir. 2010)..........................................2, 14, 15, 16

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008) .........................................................................17, 18

**AUTHORITIES**

Federal Rule of Civil Procedure 65(b) ..........................................16, 17

Federal Rule of Civil Procedure Rule 65(c) .........................................25

Federal Rules of Civil Procedure, Ch. 9, § 2951 .................................16

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    I.     **INTRODUCTION**

2          Mgame Corporation's ("Mgame") Motion for Preliminary Injunction should be

3    denied for procedural and substantive reasons.

4          **Mgame's Motion is Procedurally Improper:**  The parties agree that this dispute

5    must be resolved by arbitration in Singapore.  The arbitration rules allow Mgame to seek

6    interim relief in the arbitration.  They do not authorize a court to issue such relief.  Under

7    Ninth Circuit and Central District law, it is improper for a court to grant interim relief

8    when the applicable arbitration rules only provide for interim relief to be sought from the

9    arbitration tribunal.  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999); *China*

10   *National Metal Products Import/Export Co. v. Apex Digital, Inc.*, 155 F.Supp.2d 1174,

11   1182 (C.D.Cal. 2001).

12         If the applicable rules allowed it, and if Mgame could establish an emergency that

13   had to be addressed before the issue could be considered within the arbitration, then

14   Mgame would be entitled to seek an injunction that preserved the status quo for only so

15   long as was necessary for the request to be decided within the arbitration itself.  *Toyo Tire*

16   *Holdings of America, Inc. v. Continental Tire of North America*, 609 F.3d 975, 978-981

17   (9th Cir. 2010).  Mgame violates every aspect of this rule.  The arbitration rules do not

18   allow the request to be made to a court.  This Court has already found that there is no

19   emergency.  Order of March 27, 2012.  Mgame seeks an injunction that would alter the

20   status quo by stopping K2 from "continuing to operate, promote, publish, produce,

21   distribute and service the [Game]" and "require[ing] that K2 immediately transfer the

22   Game Servers and Billing and User Databases to Mgame."  Memo. of P's and A's at 1:5-

23   9.  And, Mgame seeks to have the requested injunction remain in place during the entire

24   pendency of the arbitration.  To date, Mgame has <u>never</u> sought any interim relief within

25   the arbitration.  Had Mgame properly done so when this dispute arose over <u>two months</u>

26   ago, Mgame's request likely would have been heard by the arbitration tribunal by now.

27         Simply put, Mgame's motion violates the holdings in *Simula*, *China National*

28   *Metals* and *Toyo* in each and every respect.  For that reason, the motion should be denied.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

1   **Mgame's Motion is Substantively Without Merit**:  Contrary to Mgame's

2   allegations, this is a <u>money dispute</u> about K2's alleged failure to pay Mgame certain

3   revenue sharing payments under a license.  In 2003, Mgame granted to K2 the exclusive

4   right to distribute the Game.  For over eight years, K2 successfully distributed, sold and

5   operated the Game.  Mgame extended the term of the license five different times, most

6   recently on June 4, 2011.  On February 2, 2012, a dispute arose regarding the amount of

7   money K2 owed Mgame.  K2 said that it did not owe Mgame any money because it had

8   previously overpaid Mgame $1.9 million.  Mgame disputed that claim and, on February

9   23, 2012, purported to terminate on that basis.  Thus, the harm that has allegedly been

10  incurred, if any, is a monetary one that is disputed and compensable through damages.

11      Any other purported harm to either Mgame or the Game itself, including without

12  limitation customer confusion or gaps in service, was a direct result of Mgame's own

13  attempts to digitally corrupt the Game in an act of vigilante self-help, to prevent K2 from

14  continuing to distribute the Game pursuant to the license during the pendency of this

15  dispute.  Any harm caused by Mgame's nefarious activities does not provide any basis to

16  issue a preliminary injunction.

17      Even if Mgame could establish a likelihood of irreparable harm (which it cannot),

18  Mgame cannot establish the threshold requirement that it is likely to prevail on the merits.

19  <u>All</u> of Mgame's claims are based on the presumed validity of Mgame's purported

20  termination of the parties' license based on K2's alleged failure to make certain money

21  payments to Mgame.  As detailed below, K2 incorrectly paid Mgame over $1.9 million

22  for "bonus" or promotional units that K2 had provided to resellers or customers *for free*.

23  These bonus units did not generate <u>any</u> revenue for K2.  K2 was not, and is not,

24  contractually required to make revenue sharing payments to Mgame on units that did not

25  generate any revenue.  Indeed, K2 has not yet recouped over $1.3 million of the amounts

26  overpaid to Mgame.  Accordingly, Mgame owes K2 money, not vice versa.

27      For each of these reasons, Mgame's motion for preliminary injunction should be

28  denied in its entirety.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## II.     STATEMENT OF FACTS

### A.     Factual Background and the Parties' Agreements

K2 is a developer and distributor of online computer games based in Irvine, California. Mgame is a developer of online computer games based in Seoul, Korea. On or about November 7, 2003, K2 and Mgame entered into an Exclusive Game Distribution and License Agreement (the "Agreement"). Declaration of Bjorn Book-Larsson, ¶ 2, Exh. A.[1] Under the Agreement, Mgame granted to K2 "the sole, irrevocable, exclusive right to operate, promote, publish, produce, distribute and service" a massively multiplayer online computer game called "Knight Online" (referred to herein as the "Game" or "KOL") for an initial two-year period. Book-Larsson Decl., Exh. A, at ¶¶ 1.1, 2.1. In return, K2 agreed to pay Mgame license fees and ongoing revenue sharing (also referred to as royalties). *Id.* at ¶¶ 5.1, 5.2.

When K2 launched KOL in North America, Europe and Turkey in 2004, the Game was completely unknown in those territories and had no prior users. Book-Larsson Decl., ¶ 3. Over the next eight years, K2's successful marketing and Game operations caused the Game to grow in K2's territories from 0 players in 2004 to 15,994,116 total players today — all of whom K2 serviced from its website, www.gamersfirst.com. *Id.* As a result of K2's successful marketing and service of the Game, Mgame granted K2 five license extensions, most recently on June 4, 2011 (the "2011 Extension Agreement") Book-Larsson Decl., Exh. B. (The Agreements and the various extensions are collectively referred to here in as the "Agreement").[2] Although Mgame often failed to perform certain of its technical support and related quality standard obligations, the two companies have, for the most part, enjoyed a prosperous eight-year relationship. Book-Larsson Decl., ¶ 5. Since 2004, the Game has accumulated more than $55 million in gross sales in K2's

---

[1] With the exception of Jim Kavanagh's declaration, K2 relies on its previously submitted declarations, copies of which have been resubmitted for the court's convenience.
[2] A complete set of the original Agreement and all extensions thereto is attached as Exhibits 1-8 to Mgame's Verified Complaint ("Complaint"). For convenience, K2 has only submitted the original Agreement and the two extension agreements relevant to this dispute: (1) the June 6, 2009 Extension Agreement, and (1) the June 4, 2011 Extension Agreement.

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

1    territories as a result of K2's successful operation of the Game. *Id.*

2    **B.    The Revenue Sharing Dispute**

3         In January 2012, K2 discovered that it had been overpaying Mgame in monthly

4    revenue sharing payments for revenues associated with Electronic Serial Numbers ("ESNs

5    or EPINs") — an electronic code which allows KOL players to make in-game purchases.

6    Declaration of Rahul Sandil, ¶ 2.  As K2 explained to Mgame beginning on or before

7    February 2, 2012, K2 learned that in addition to the revenue sharing payments K2 had

8    been making to Mgame for the EPINs K2 *sold*, K2 had also been paying Mgame revenue

9    sharing payments based on promotional EPINs that K2 gave away for *free* to customers

10   and resellers in all of K2's licensed territories, and, primarily, to Mgame's subsidiary,

11   Game Café Services, LLC/Inc.[3] ("GCS").  *Id.* at ¶ 2.  In other words, K2 had been

12   mistakenly paying Mgame "revenue" sharing payments for promotional EPINs that had

13   never generated any revenue. *Id.* at ¶ 2.

14        In early 2012, K2 (i) notified Mgame of its mistake; (ii) notified Mgame that K2

15   would apply its overpayments to payments due on January 15 and February 15, 2012; and

16   (iii) demanded that the remainder of its overpayments be returned. *Id.* at ¶ 3.  Mgame

17   flatly refused and on February 23, 2012, Mgame repudiated the Agreement on the grounds

18   that K2 had failed to make two revenue sharing payments due on January 15 and February

19   15, 2012. *Id.* at ¶ 4.  Mgame asserted as a defense that K2 should have made revenue

20   sharing payments to Mgame for the *free* EPINs that K2 gave away, *even though K2 never*

21   *realized any <u>revenue</u> for these EPINs*.  Complaint, ¶ 27, at 7:15-17.  Not only does

22   Mgame's argument defy common sense, it also contradicts the express language of the

23   parties' 2009 Extension Agreement.  *See* Book-Larsson Decl., Exh. C.

24        Article 5 of the 2009 Extension Agreement specifies that K2 is only required to

25   share revenues that K2 receives into its bank account:

26             [K2] shall pay monthly Revenue Sharing to [Mgame] on all

27   _____
     [3] K2 has recently learned that GCS, LLC — the entity the parties designated as the
28   exclusive reseller of EPINs in Turkey — converted into a corporation just months after
     the limited liability company formed.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    revenues generated, collected and recharged from the product

2    but not limited to EPIN (which [K2] calls ESN) and all of

3    other billing methods of KOL beside EPIN and all of ordinary

4    users into the bank account of [K2] without any sales, channel

5    and marketing costs deducted.

6   Book-Larsson Decl., Exh. C, at Article 5, subpar. i. (Emphasis added).

7        Article 6 of the 2009 Extension Agreement further specifies that K2 cannot deduct

8   certain costs from the amount of revenue K2 receives into its bank account for purposes of

9   calculating revenue sharing:

10    "[K2] shall pay monthly Revenue Sharing...without deducting

11    any sales costs, channel costs, marketing costs, discount costs

12    in Turkey and other countries and any related costs including

13    but not limited to business tax, operation tax, value added tax

14    and sales tax of EPIN."

15   Book-Larsson Decl., Exh. C, at Article 6, subpar. i. (Emphasis added).

16        In other words, the parties agreed that the revenue sharing calculation would begin

17   with the amount of revenue K2 received into its bank account, and that K2 would not

18   deduct certain out-of-pocket *costs* when calculating revenue sharing. Nowhere in the

19   2009 Extension Agreement did K2 agree to pay Mgame for revenues that K2 never

20   received into its bank account or for phantom revenues on EPINs that K2 gave away for

21   free. Book-Larsson Decl., Exh. C  Indeed, Mgame adduces *no evidence* in its Complaint

22   to support its contention that the parties intended for the above-quoted language to mean

23   that free, promotional EPINs would constitute a "discount cost," other than the bald

24   conclusory statement that they did. Complaint, ¶¶ 26-28, at 7:7-28, 8:1-3.

25        The contemporaneous evidence shows that the only EPIN revenue cost that the

26   parties contemplated when they negotiated and executed the 2009 Extension Agreement

27   and 2009 GCS Operating Agreement was a 10% EPIN revenue deduction that K2 had

28   been taking across the board before calculating EPIN royalties owed to Mgame.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  Declaration of Jim Kavanagh, ¶3.  Prior to 2009, K2 had incurred costs associated with

2  selling the EPINs directly to resellers and the public.  With the creation of GCS, K2 would

3  no longer incur such costs.  Mgame therefore wanted to eliminate the 10% revenue

4  deduction because it felt that the deduction would now be a "phantom cost."  *Id.*  The

5  evidence shows that Mgame came up with a new formula for calculating revenues that

6  eliminated this EPIN deduction, (Kavanagh Decl., Exh. A) which was then incorporated

7  into the 2009 Extension Agreement.  Kavanagh Decl., ¶3. The contemporaneously

8  executed "deal memo" shows the old revenue calculation and this new calculation, but

9  says <u>nothing</u> about royalties for free, promotional EPINs — because K2 had <u>never</u> agreed

10  to pay such royalties.  Kavanagh Decl., Exh. A.

11    **C.    <u>Mgame's Failure to Provide Adequate Technical Support</u>**

12    Even if K2 had not discovered its mistaken overpayments, K2 would still be

13  contractually entitled to withhold revenue sharing payments from Mgame because Mgame

14  has utterly failed to fulfill its technical support obligations.  In 2003, Mgame agreed that,

15  "[i]f Mgame fails to fulfill its technical support, the upcoming payments that are due at

16  that time can be delayed by [K2] for the same period of time as the delay in conversion

17  support only."  Book-Larsson Decl., Exh. A, ¶ 4.2.  Mgame's "technical support"

18  obligations are set forth in numerous parts of the Agreement.

19    Rather than fulfill its technical support obligations, Mgame has instead relied on

20  K2's own engineering staff to support the Game, which has caused K2 considerable

21  financial loss.  From October 2011 through February 2012, Mgame failed to fix numerous

22  critical issues in the Game and instead encouraged K2 engineers to fix the problems

23  themselves.  As of today, Mgame has still not resolved these critical technical support

24  problems.  A summary of Mgame's ongoing technical support failures from October 2011

25  to present is described in the Declaration of Joey Hibbard filed concurrently herewith.

26    **D.    <u>Mgame Wrongfully Interfered With K2's Ability to Operate the Game</u>**

27    **<u>Even *Before* Mgame Wrongfully Repudiated the Agreement</u>**

28    As discussed above, on February 23, 2012, Mgame wrongfully repudiated the

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

1  Agreement. But even prior to Mgame's wrongful repudiation — and while K2 was

2  indisputably a lawful, exclusive licensee — Mgame engaged in numerous wrongful acts

3  intended to disrupt K2's ability to operate the Game.[4] Mgame's pre-repudiation wrongful

4  acts include, but are not limited to, at least four attempts to surreptitiously insert "poison

5  pills" into the software K2 uses to operate the Game.

6  ### 1.  Poison Pill #1

7  On or about February 1, 2012, K2 requested an "Ebenezer file"[5] patch for its game

8  software so that K2 could continue to operate KOL. Sandil Decl., ¶ 5. In response,

9  Mgame sent K2 an Ebenezer file on February 6, but also included a "game launcher"

10  software update file which K2 did not request. *Id.* K2 expressed surprise at the inclusion

11  of the game launcher file because K2 did not have any problems with its game launcher.

12  *Id.* When K2 told Mgame that K2 planned to test the new game launcher file before

13  implementing it, Mgame insisted that K2 implement the new file immediately and

14  distribute it directly to millions of K2 customers without any testing by K2. *Id.*

15  Suspicious, K2 tested the game launcher file and discovered secret code that

16  Mgame now admits that it tried to hide from K2. Complaint, ¶45, at 12:14-15 ("Mgame

17  designed this feature of the launcher to be undetectable to K2…."). Mgame also now

18  admits that it sent K2 the game launcher file for the sole, undisclosed purpose of enabling

19  Mgame to redirect all of K2's hard-earned, KOL users to a server maintained and

20  controlled by Mgame's United States subsidiary, Mgame USA, Inc. *Id.* ¶45, at 12:10-13

21  ("…this launcher would give Mgame the option to redirect players to its own Game

22  website…"). Given that the users have played the game from K2's website for eight

23  years, such a "redirect" would also be incredibly harmful to the Game. Sandil Decl., ¶ 5.

[4] Presumably, Mgame did so for the purpose of transferring K2's hard-earned players over to Mgame's competing service that it launched in October 2011.
[5] On January 9, 2012, Mgame informed K2 that unless Mgame provided K2 with an "Ebenezer file" to patch K2's game software, KOL would automatically cease to function on February 9, 2012 — 30 days later. Mgame refers to the "Ebenezer files" in its Complaint as a "security feature," but provides no explanation as to why such files are necessary or that such files serve any legitimate purpose under the Agreement, nor what type of "security" such feature aims to provide other than the ability to illegally and unilaterally terminate the Game at will. Complaint, ¶ 16, at 4:4-14.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

7

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

### 2.   Poison Pill #2

On February 8, 2012, after numerous complaints by K2 about having received a launcher update file it never asked for, Mgame sent K2 a new Ebenezer file without the launcher function included. Sandil Decl., ¶ 6.  This new file instead contained an updated "poison pill" now in the form of a new "time-bomb" function. *Id.* This time, Mgame informed K2 that with the new Ebenezer file, the Game would self-destruct in 14 days — *i.e.*, on or about February 22, 2012 — unless Mgame provided K2 with a new Ebenezer file before that time. *Id.*

### 3.   Response to Poison Pill #2; K2's Actions to Preserve the Game

On February 21 at 4:17pm, Joey Hibbard, K2's Game Producer for KOL, sent an email to the Mgame team requesting a new "Ebenezer file extension" to avoid the imminent destruction of K2's operation the Game that was scheduled to occur within 24 hours. Sandil Decl., ¶ 7.  On February 21 at 5:35pm, Mgame's Steven Choi replied and said that if K2 refused to immediately launch the "game launcher" (*i.e.*, poison pill #1, described above) to all of its users, then Mgame would not provide K2 with a new Ebenezer file.  In other words, if K2 refused to comply with redirecting all of its users to Mgame, Mgame would automatically shut down all of K2's Game servers. *Id.* at ¶ 8.

On February 22, 2012, K2 remained hopeful for a resolution and even received an email from one of Mgame's employees which said: *"Both Server and Client files are prepared, but we are waiting for the approval from Steven [Choi]." Id.* However, when such approval from Mr. Choi never arrived, it became clear to K2's management that Mgame was intent on destroying K2's ability to operate the Game that evening. *Id.*

When K2 inspected the Ebenezer files and discovered that such files had no digital security mechanisms whatsoever, K2 realized it could modify the Ebenezer "time-bomb" function and defuse it, <u>without the need for reverse engineering</u>. *Id.* Given Mgame's intent to destroy the Game on February 22, K2 knew that the other avenue open to Mgame to imminently destroy the Game was to simply shut down the Database Servers. *Id.*

### 4.   K2's Game-Rescue Operations

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

1    After not receiving any updates on February 22, 2012 that would allow the

2    continued operation of the Game, K2 took action to protect itself against further wrongful

3    acts by Mgame. That evening, K2 decided to disable Mgame's Ebenezer "time-bomb"

4    system, if it became necessary to do so. *Id.* at ¶ 10. As evening approached, and

5    Mgame's Ebenezer time-bomb deadline grew closer, K2 instructed two of its employees,

6    Joshua Clausen and Duncan Bowring, to retrieve back-up external hard-drives <u>that</u>

7    <u>belonged to K2</u> from Mgame's server cage at the Latisys data center and that would

8    enable K2 to continue to lawfully operate KOL under the Agreement. *Id.* Earlier that

9    day, at 11:03 a.m., K2's employee Matt Gee had also entered Mgame's server cage to

10    perform routine maintenance.[6] Declaration of Matt Gee, ¶¶2-5.

11    Gee, Clausen and Duncan had full authorization to enter Mgame's server cage at

12    Latisys, and as the main operator of the Game, K2 had the combination code to do so

13    lawfully by being an authorized Point of Contact ("POC"). Sandil Decl., ¶11. Under

14    Article 8, paragraph 7, of the 2011 Extension Agreement, Mgame agreed to "irrevocably

15    appoint [K2] as the sole Point of Contact with the Authorized Data Center." Book-

16    Larsson Decl., Exh. B. Mgame <u>did in fact appoint</u> *K2* as the sole POC with Latisys

17    (which gave K2 administrative access to, and the ability to remove equipment from, the

18    cage); otherwise, Latisys would have refused to permit K2 employees to enter Mgame's

19    server cage. Sandil Decl., ¶ 11. K2 employees cannot enter without Latisys allowing it,

20    and Latisys allowed it only because Mgame had told Latisys that K2 had permission to

21    access the servers. *Id.* K2 employees were required to, and did, regularly access the cage

22    in the ordinary course of operating the Game. *Id.* Even if this were not the case, Gee,

23    Clausen and Duncan still would have been justifiably present because (i) Gee was there to

24    perform regularly scheduled maintenance needed to keep the Game operating; and (ii)

25    _____

26    [6] Mgame's "information and belief" allegations that "during his visit, Gee blocked
Mgame's remote VPN and IP access to the User and Billing Servers and disabled
27    Mgame's administrative password, thereby effectively terminating Mgame's access to the
Game and its ability to monitor K2's activities" are false. Gee Decl., ¶5. Mgame's own
Exhibit 13 proves the falsity of these allegations because the "camera footage" shows that
28    Mr. Gee spent only three minutes in Mgame's server cage.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

1    Clausen and Duncan were there to retrieve property that belonged to K2, *i.e.*, <u>K2's</u> back-

2    up external hard drives, and to enable K2 to continue lawfully operating KOL despite

3    Mgame's wrongful attempts to disrupt K2's ability to do so. *Id.* As part of standard IT

4    procedures Clausen and Duncan logged in to the servers using a standard IT password

5    reset procedure to verify that the backups stored on the hard-drives were in fact the latest

6    and correct versions of the files. *Id.* Due to Mgame's actions later that night, they were

7    denied the ability to restore the normal login functions to those systems. *Id.*

8              **5.      <u>Poison Pills #3 and #4</u>**

9         Even as K2 employees worked to safeguard the continued operation of the Game,

10   negotiations between K2 and Mgame continued, and in the early morning of February 23,

11   Mgame sent another update file to K2 purporting to "solve" the issues. *Id.* at ¶ 12. This

12   time, Mgame surreptitiously included copyrighted lyrics to Michael Jackson's song, "Heal

13   the World." *Id.* Presumably, Mgame did so with the intention that K2 would launch the

14   new version and unknowingly commit copyright infringement by reproducing the lyrics

15   through its operation of the updated software. But having learned from Mgame's previous

16   cloak-and-dagger tactics, K2 thoroughly investigated the Ebenezer file update before

17   implementing it and discovered the hidden copyrighted materials. *Id.* When K2

18   confronted Mgame with this discovery, Mgame asserted that it had included Michael

19   Jackson's song lyrics "to protect [KOL] against hacking tool [sic] and keep it long last

20   [sic]." (*Id.*) In response, K2 requested that Mgame provide a "clean" Ebenezer file

21   without any copyrighted materials belonging to third parties. *Id.*

22        When confronted with the contents of the file in the morning of February 23, 2012

23   Mgame sent K2 yet another Ebenezer file an hour later with the false promise that the file

24   would allow K2 to continue operations. *Id.* at ¶ 13. But K2 quickly discovered — and

25   Mgame now admits — that the Ebenezer file sent on February 23 contained a time-bomb

26   function which would have extended K2's ability to operate KOL <u>only until the end of</u>

27   <u>that day</u> and would thereafter have destroyed K2's ability to operate KOL. Complaint, ¶

28   48, at 11:1-3.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1     To prevent Mgame from hijacking the Game and from interfering with K2's lawful

2 operation of the Game, K2 was forced to briefly take the Game offline. *Id.* at ¶ 14. This

3 initial "down time" lasted less than 24 hours before service was partially restored. *Id.*

4 This disruption to the Game was directly caused by Mgame's self-help attempts to wrest

5 control of the Game away from K2, all of which occurred <u>before</u> Mgame had even

6 purportedly terminated the Agreement. *Id.*

7     **E.**     **The Status Quo**

8     K2 has operated KOL successfully for more than eight years and has continued to

9 grow the business even <u>after</u> Mgame's wrongful repudiation. In fact, from the period of

10 March 1 through March 20, 2012, the version of KOL operated by K2 had 1.5% <u>more</u>

11 average daily users than the period of October 1, 2011 through January 31, 2012. Book-

12 Larsson Decl., ¶ 7. Additionally, the revenues for the game <u>increased</u> from average

13 monthly revenues of $412,500 during the period October 1, 2011 through January 31,

14 2012, to a run-rate of well over $530,000 for the month of March, 2012, representing a

15 28% increase in revenues. *Id.*

16 **III.**     **ARGUMENT**

17     **A.**     **This Court Is Not Empowered To Issue The Relief That Mgame Seeks.**

18     Mgame argues that this Court is authorized to order the requested relief because

19 the applicable arbitration rules and Ninth Circuit law authorize it. Mgame is wrong for

20 numerous reasons.

21     **1.**     **The Applicable Arbitration Rules Do Not "Authorize" a Judicial**

22          **Authority to Issue Interim Relief.**

23     In its TRO moving papers, Mgame wrote as follows: "Under Article 26 of the

24 UNCITRAL Arbitration Rules, which apply here, interim measures may be granted by a

25 judicial authority to protect a party from harm as a result of the time attendant to

26 constituting the arbitral tribunal." Mgame Memo. of P's and A's at 2:19-22, citing

27 1976 UNCITRAL Arbitration Rules, Articles 26.1 and 26.3. In fact, Article 26.1 says

28 nothing about a "judicial authority" doing anything. It provides that the "<u>arbitral tribunal</u>

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

may take any interim measures it deems necessary in respect of the subject matter of the dispute . . . ." (emphasis added).  After K2 noted in its opposition to Mgame's application for a TRO what Article 26.1 actually says, Mgame dropped its reliance on Article 26.1 and focused instead in its TRO Reply ("Reply") only on Article 26.3.  Mgame Reply at 2:14-20.

Article 26.3 uses the term "judicial authority" but not as Mgame argues.  Article 26.3 provides as follows:  "A request for interim measures addressed by any party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of that agreement."  It says nothing about what a judicial authority is "authorized" to do or not do.  Nonetheless, Mgame continues to claim that Article 26.3 "authorize[s] a 'judicial authority' to provide interim relief."  Reply at 2:13-14.

The language speaks for itself.  Deeming an action that might be taken in a judicial proceeding to not constitute a waiver of arbitration is not the same as "authorizing" or "empowering" a judicial authority to give consideration to that action.  It is disingenuous for Mgame to claim that it is.

The fact that they are not the same thing is illustrated by the discussion of Article 23 of the ICC Rules in *Toyo*, *supra*, 609 F.3d at 979.  In that case, the court quoted and emphasized in italics the language that led the court to conclude that it could consider a request for interim injunctive relief.  The language from the case is as follows:

"The ICC Rules provide in relevant part:

Article 23 Conservatory and Interim Measures

(1)  Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. . . .

(2)  *Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for*

K2 NETWORK, INC.'S OPPOSITION TO MGAME'S PRELIMINARY INJUNCTION

GREENBERG GLUSKER FIELDS CLAMAN<br/>& MACHTINGER LLP<br/>1900 Avenue of the Stars, 21st Floor<br/>Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    *interim or conservatory measures.*  The application of a party

2    to a judicial authority for such measures or for implementation

3    of any such measures ordered by an Arbitral Tribunal shall not

4    be deemed to be an infringement or a waiver of the arbitration

5    agreement and shall not affect the relevant powers of reserved

6    to the Arbitral Tribunal. . . ."

7    *Id.* (italicized emphasis by the court).  The court did <u>not</u> emphasize or comment upon the

8    second sentence of Article 23(2) of the ICC rules, which is the equivalent of Article 26.3

9    of the UNCITRAL Rules.  Instead, it quoted and emphasized the first sentence, which

10   contains language that is <u>not in the UNCITRAL Rules</u>, to find that "Article 23 of the ICC

11   Rules provides that . . . (2) 'any competent judicial authority' may order interim injunctive

12   relief before the file is transmitted to the [arbitration] panel and 'in appropriate

13   circumstances even thereafter.'"  *Id.*

14          In sum, Article 26.3 of the UNCITRAL Rules does not authorize anything.  While

15   it necessarily recognizes that a party might go to court to seek interim relief (by explicitly

16   stating that doing so will not be deemed a waiver), it defers to the parties' contract or the

17   judicial authority itself to decide whether a party is "authorized" to do so.  Here, there is

18   no provision in the parties' contract authorizing a party to seek provisional relief from a

19   court pending the arbitration.  *See* Complaint, Exhs. 1-8.  So, Mgame must rely on federal

20   law.[7]

21          2.    ***Simula* Prohibits Consideration of Mgame's Request**.

22          Generally, a party subject to an arbitration provision may not seek provisional

23   relief from a federal court when the applicable arbitration rules allow that party to seek

24   such relief within the arbitration.  *Simula, supra,* 175 F.3d at 725 (holding that the district

25   court "correctly denied Simula's request for a preliminary injunction" pending arbitration

26   
27   [7] Mgame also argues that some commentators have opined that parties are "free to make
     applications [for interim measures] to arbitrators or courts with no hindrance at any time."
     Reply, at 2:17-21.  Yet, as between these commentators and controlling Ninth Circuit and
28   Central District case law, K2 would argue that case law prevails.

K2 NETWORK, INC.'S OPPOSITION TO
                                        MGAME'S PRELIMINARY INJUNCTION

1    because provisional relief was available in the arbitration itself).

2              "Because the district court correctly concluded that all of

3              Simula's claims were arbitrable and the ICC arbitral tribunal is

4              authorized to grant the equivalent on an injunction *pendente*

5              *lite*, it would have been inappropriate for the district court to

6              grant preliminary injunctive relief."

7    *Id.*; *see also China National Metal, supra*, 155 F.Supp.2d at 1182 ("In this case, as in

8    *Simula*, the arbitral rules authorize provisional relief.…[T]he parties have agreed to abide

9    by arbitration rules which provide a method and forum for obtaining provisional relief.

10   *Simula* dictates that the court must respect that agreement and refrain from awarding

11   provisional relief when the parties have provided other means to obtain such relief.")

12          Here, the arbitration rules that are referenced in the parties' contract allow for a

13   party to seek interim relief, including emergency interim relief, within the arbitration.  The

14   2009 Extension Agreement, which contains the arbitration provision, provides both (1)

15   that the dispute shall be settled by arbitration "in accordance with the UNCITRAL

16   Arbitration Rules as at present in force," and (2) that the arbitration shall be administered

17   by the SIAC "in accordance with its practice rules and regulations."  Exh. 5 at Article 8.

18          The UNCITRAL Rules "in force" in 2009 were the 1976 rules.  Article 26.1 of the

19   1976 rules allows the arbitral tribunal to issue "any interim measures it deems necessary

20   in respect of the subject-matter of the dispute . . . ."  Although the UNCITRAL Rules of

21   1976 do not address a request for emergency interim relief before the tribunal is

22   constituted, there is nothing in those rules that prohibit such a request.  In any event,

23   however, the SIAC rules, which are also contractually deemed to apply, expressly allow

24   for emergency relief before the tribunal is constituted.  SIAC Rules, Article 26 and

25   Schedule 1 thereto.  Paragraph 2 of Schedule 1 to the SIAC Rules requires the Chairman

26   of the SIAC to appoint an emergency arbitrator to hear a request for such relief "within

27   one business day of receipt by the Registrar of such application and payment of any

28   required fee."  The emergency arbitrator is then required to set a schedule for

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

1    consideration of the request within two business days of being appointed. *Id.* at Schedule

2    1, ¶ 5.

3           Accordingly, the applicable arbitration rules allow for a party to seek interim relief

4    from the tribunal and emergency interim relief from an emergency arbitrator before the

5    tribunal is constituted. Therefore, under the holdings of *Simula* and *China National*

6    *Metals* the Court may not entertain Mgame's request.

### 3.    Mgame's Request Also Violates the Holding in *Toyo*.

8           In its Reply in support of its TRO application, Mgame sought to distinguish the

9    instant case from *Simula*, arguing that the Ninth Circuit decision of *Toyo, supra,* 609 F.3d

10   975, 978-981 (9th Cir. 2010) applies instead. Again, Mgame is wrong.

11          In *Toyo*, three tire companies, Toyo, Yokohama and Continental entered into a

12   partnership called GTY in 1998. GTY manufactured tires for each of the partners to then

13   distribute. In December 2009, Yokohama and Continental stated their intent to dissolve

14   the partnership. The parties then met on January 8, 2010. At that meeting, Continental

15   and Yokohama informed Toyo that they "intended to dissolve the partnership, effective

16   January 13, 2010, and that they planned to take Toyo's entire allocation of GTY tires."

17   *Id.* at 977-78. On January 11, 2010, Toyo requested arbitration with the International

18   Chamber of Commerce ("ICC") International Court of Arbitration. Within its Request for

19   Arbitration, Toyo requested interim injunctive relief. *Id.* at 978. On the same day, Toyo

20   sued in court. Three days later, on January 14, 2010, Toyo asked for a preliminary

21   injunction in court.

22          Toyo's proposed injunction was to "preserve the status quo until the *arbitral*

23   *tribunal* can consider and rule upon Toyo's application for interim relief pending the

24   arbitration panel's final decision." *Id.* at 980. Toyo was asking the court to prevent

25   Continental and Yokohama from (1) terminating Toyo's status as a partner in GTY, (2)

26   disrupting GTY's supply of tires to Toyo, and (3) making false, disparaging,

27   inflammatory, or other defamatory statements to Toyo's customers or other third parties

28   regarding Toyo's assets, the partnership, or Toyo's ability to supply tires.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

1    Under that factual scenario, the Court held that Toyo's request for an injunction

2  could be considered by the court.  The court noted that the applicable arbitral rules

3  expressly provided that a party in the arbitration "may apply to any competent judicial

4  authority for interim or conservatory measures."  As noted above, the court cited and

5  emphasized this fact in its opinion.  *Id.* at 979 (quoting with emphasis Article 23(2) of the

6  ICC Rules).  The court then stressed that the proposed injunction was limited to

7  preserving the status quo and was limited in duration until the arbitration tribunal could

8  consider the request for interim relief.  *Id.* at 979-80.  The court concluded as follows:

9           Thus, in *Simula* we did not decide the question presented here

10          -- whether a court may grant interim relief pursuant to Article

11          23(2) of the ICC Rules to maintain the status quo while the

12          parties are awaiting the creation of an arbitration panel and a

13          decision by that panel with respect to the injunctive relief.

14  *Id.* at 980 (emphasis added).

15    None of those facts are present here.  First, there is no equivalent of Article 23(2)

16  of the ICC Rules in the arbitration rules that apply here.  Mgame is not able to make a

17  request "pursuant to" a rule within the arbitration, because no such rule exists.

18    Second, even if there was some arbitration rule that authorized it, Mgame does not

19  seek to preserve the status quo while the parties are awaiting the creation of an arbitration

20  panel and a decision by that panel with respect to the injunctive relief.  Mgame seeks to

21  alter the status quo.  It seeks an order (1) enjoining K2 from "continuing" to operate the

22  Game, (2) requiring K2 to "return the Game Servers and the Billing and User Databases to

23  Mgame," (3) requiring K2 to "provide Mgame with up-to-date sales information," and (4)

24  requiring K2 to take any other steps necessary to "transfer control of the Game to

25  Mgame."  *See* Proposed Order to Show Cause for Preliminary Injunction at 2:11-26.  That

26  is the opposite of the relief Toyo was requesting in *Toyo*.

27    "Status quo" means "the last uncontested status which preceded the pending

28  controversy."  *Goto.com, Inc. v. The Walt Disney Company*, 202 F.3d 1199, 1210 (9th Cir.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

2000).  Yet, each of Mgame's requests would change the status quo from "the last uncontested status which preceded the pending controversy."  K2 has been operating the Game for more than eight years.  It continues to do so today.  It currently possesses the Game Servers and Billing and User Databases.  It currently possesses the sales information.  Mgame seeks to change each of these existing circumstances.  Such an order would violate the holding in *Toyo*.[8]

Third, unlike Toyo, Mgame did not act timely in seeking interim relief within the arbitration.  Mgame did not bother to initiate the arbitration until March 26, 2012, after first moving twice for a temporary restraining order in this Court.  And it has still never filed any application for interim relief in the arbitration.  The alleged breach that underlies Mgame's request occurred on January 15, 2012.  Assuming Mgame had a right to terminate, it could have exercised that right by as early as January 23, 2012.  If it had commenced the arbitration and requested interim relief then, as Toyo did, then (under the UNCITRAL Rules and/or the SIAC Rules) it could have had its request for interim relief heard by now (or at least by April 30, 2012) within the arbitration.

As the Court noted in its Order denying the application for a TRO, Mgame's own actions belie its claim of any emergency.  March 27, 2012 Order.  If there is no emergency, then there is no reason why this Court should decide this issue.  The arbitrators should decide it and could have decided it already had Mgame bothered to pursue its request within that contractually-mandated forum in a timely fashion.

Finally, Mgame also explicitly seeks to have the injunction remain in place until

---

[8]  Mgame relies on *Goto.com* to argue that the "last uncontested status" cannot possibly be K2's allegedly "infringing" conduct.  Reply at 5:1-3.  However, in *Goto.com*, the defendant was a "naked" infringer — it was not operating under a preexisting license from the plaintiff.  Thus, the defendant's use of the allegedly infringing trademark was the contested status.  The last uncontested status was the time before the defendant had begun using the allegedly infringing logo.  By contrast, the last uncontested status between K2 and Mgame was K2's operation of the Game pursuant to the terms of the license.  Unlike the situation in *Goto.com*, the controversy is not whether K2 has the right to distribute the Game *at all*, but is instead whether Mgame is entitled terminate K2's rights under the parties' Agreement.  Prior to this dispute, K2 unquestionably had the lawful right to operate the Game under the parties' Agreement.  That is the "last uncontested status."

the "resolution of the dispute between Mgame and K2 through contractually mandated arbitration." Proposed Order to Show Cause for Preliminary Injunction at 2:6-7 (emphasis added). This presumably explains why Mgame has not bothered to file any request for injunctive relief within the arbitration. It wants this Court to issue an injunction that would remain in place during the pendency of the arbitration, until the final award is issued. This aspect of the requested relief independently violates the holding in *Toyo* because it takes away from the arbitral tribunal its jurisdiction to decide any entitlement to interim relief.

In sum, the Court is not empowered to issue the type of relief that Mgame seeks. It would violate the holdings in *Simula*, *China National Metals* and *Toyo* in multiple respects. For that reason, the motion should be denied.

**B.     Mgame Cannot Meet The Requirements For Issuance Of A Preliminary Injunction.**

"A court may grant a preliminary injunction only if the plaintiff establishes four elements: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm absent a preliminary injunction; (3) the balance of equities tips in the plaintiff's favor; and (4) injunctive relief is in the public interest." *Leigh v. Salazar*, 668 F.3d 1126 (9th Cir. 2012); *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Even if the Court determines that it has jurisdiction to issue interim relief, and even if the Court finds that Mgame seeks to maintain the status quo, Mgame cannot establish any of these factors.

**1.     Mgame Cannot Establish A Likelihood Of Success On The Merits.**

Mgame asserts claims against K2 for breach of contract, copyright infringement, trademark infringement, conversion and violation of the Computer Fraud and Abuse Act. All of these claims are based on the presumed validity of Mgame's purported termination of the parties' Agreement based on K2's alleged failure to make certain revenue sharing payments to Mgame, which K2 vehemently disputes. Specifically, Mgame's copyright and trademark infringement claims are based on K2's continued distribution of the Game

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   after the purported termination on February 23, 2012.  Likewise, Mgame's claims for

2   conversion and computer abuse are based on the premise that K2's access to Mgame's

3   servers — access which was specifically given to K2 under the parties' Agreement and

4   which was necessary to operate the Game in the ordinary course — was wrongful because

5   of Mgame's purported termination of the Agreement.  Although Mgame devotes the

6   majority of its papers to the purportedly "wrongful" conduct of K2 that occurred after the

7   alleged termination date, Mgame has not established, and cannot establish, the

8   fundamental issue critical to its claims:  that Mgame's termination of the Agreement for

9   the alleged underpayment of royalties is valid and effective.

10          As a threshold matter, Mgame cannot demonstrate that K2 failed to pay Mgame its

11   share of revenues.  As K2 explained to Mgame beginning on February 2, 2012, K2

12   discovered that it had incorrectly been paying Mgame for "bonus" or promotional EPINs

13   that K2 had provided to resellers or customers *for free*.  These bonus EPINs did not

14   generate <u>any</u> revenue for K2.  K2 was therefore not contractually required to make

15   revenue sharing payments to Mgame on units that did not generate any revenue.  Mgame

16   points to no contractual language which gives it the right to receive revenue sharing

17   payments on these free units.  There is none.

18          Furthermore, Mgame asserts that it was entitled to receive royalties on free EPINs

19   because it had obtained "contractual concessions" after "extensive negotiations" with K2.

20   Complaint, ¶ 28, at 7:22-24.  Mgame has no evidence to support this assertion.  In fact,

21   the contemporaneous evidence shows that the <u>only</u> EPIN revenue cost that the parties

22   contemplated eliminating when they negotiated and executed the 2009 Extension

23   Agreement and 2009 GCS Operating Agreement was a 10% EPIN revenue deduction that

24   K2 had been taking across the board before calculating EPIN royalties owed to Mgame.

25   Kavanagh Decl., Exh. A.  The evidence says <u>nothing</u> about royalties for free, promotional

26   EPINs — because K2 had never agreed to pay such royalties.  *Id.*

27          The absurdity of Mgame's position is further demonstrated by the fact that the

28   overwhelming majority of free "bonus" units on which Mgame now seeks a share were

19

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    provided to GCS, an entity affiliated with, and wholly controlled by, Mgame.  The entire

2    purpose of GCS is to act as Mgame's agent for the distribution of EPINs in Turkey (where

3    the vast majority of EPIN sales occur).  Mgame is asking the Court to find that K2 acted

4    wrongfully because it failed to pay Mgame monies on non-revenue generating bonus units

5    that were, in essence, provided to Mgame for *free*.  Thus, Mgame claims that it was

6    entitled to receive both the free, bonus EPINs to distribute to the public as it so chose and

7    a royalty on the very same free units it received.  Mgame's position is overreaching in the

8    extreme.  It would mean that Mgame would receive more than 100% of any revenue those

9    free EPINs would have generated if Mgame's subsidiary, GCS, then sold them to the

10   public.  Accordingly, Mgame is unlikely to prevail on its argument that it is entitled to

11   receive a revenue sharing payment on these non-revenue generating, free bonus EPINs.

12       Mgame also claims that, even if K2 overpaid Mgame, K2's obligation to make

13   additional revenue sharing payments is unrelated to the overpayment.  Mgame is wrong.

14   The overpayment to Mgame and the amount of any additional royalties due, if any, are not

15   independent covenants.  The entire royalty dispute — i.e., K2's overpayment of royalties

16   to Mgame and any additional amounts that may be due, if any, to Mgame for the

17   accounting periods ending January 15 and thereafter — arises from the same contractual

18   provision, and solely involves K2's obligations to account to and pay Mgame the revenue

19   sharing payments to which it is entitled.  There is no separate "independent covenant"

20   relating to Mgame's obligation to return amounts paid to it in error.  For each accounting

21   period, K2 is obligated to calculate the amounts owed to K2.  Nothing in the Agreement

22   prohibits K2 from correcting accounting errors, in either party's favor.  Yet Mgame asks

23   the Court to find that, even if K2 grossly overpaid Mgame, K2 must not only continue to

24   overpay Mgame, it must seek relief in Court for the amount of the continually increasing

25   overpayment.  Mgame's position is not supported by the parties' Agreement or any law.[9]

26   _____

27   [9] Mgame's contention that "K2 cannot rely on the principle of equitable set-off to justify
     its failure to make monthly payments" (Reply, at 6, fn. 1) misconstrues K2's position.  K2
28   is not asserting a "set-off."  K2 is asserting that it does not owe Mgame money for
     monthly royalty payments because it has overpaid Mgame for monthly royalty payments.

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    Even if K2 had not discovered its mistaken overpayments to Mgame, K2 would

2    still be contractually entitled to withhold the January 15 and February 15, 2012 revenue

3    sharing payments because Mgame has failed to fulfill its technical support obligations.

4    *See* Hibbard Decl.  The Agreement explicitly permits K2 to delay further payments to

5    Mgame so long as there has been a delay in conversion support for the Game.  Book-

6    Larsson Decl., Exh. A, ¶ 4.2.  No "notice" is required.  *Id.*  Mgame's "technical support"

7    failures are numerous, pervasive and ongoing and, therefore, provide further justification

8    for K2's failure to make additional royalty payments to Mgame.  *See* Hibbard Decl.

9    To date, K2 has overpaid royalties to Mgame by approximately $1.3 million (the

10   original overpayment of $1.9 million has been reduced by other revenue sharing amounts

11   which would have otherwise been payable to Mgame).  Sandil Decl. ¶ 14.  Given that it is

12   Mgame who owes money to K2, Mgame is unlikely to prevail on the merits of its breach

13   of contract claims.  As a result, Mgame is unlikely to establish that its purported

14   termination was valid and effective.  Without a valid termination, K2 is, and remains, the

15   exclusive distributor of the Game.  As such, it is entitled to continue distributing and

16   operating the Game pursuant to the Agreement.

17   Despite the obvious defects with Mgame's claim for underpayment of royalties and

18   the validity of its purported termination, Mgame brazenly argues that because it

19   unilaterally declared the Agreement terminated, K2's continued distribution of the Game

20   constitutes copyright and trademark infringement, and its actions in connection with the

21   continued operation of the Game constitute conversion and computer abuse.  None of

22   these claims, however, becomes relevant unless and until Mgame first establishes that its

23   purported termination of the Agreement was valid and effective.  It has not yet done so.

24   So long as the Agreement is in effect, Mgame cannot assert a claim against K2 for

25   copyright infringement or trademark infringement.  Mgame does not allege, and has no

26   basis to allege, that K2 exceeded the scope of the license. *MDY Industries, LLC v.*

27   *Blizzard Entertainment, Inc.*, 629 F.3d 928, 940 (9th Cir. 2010) (party seeking to sue a

28   licensee for copyright infringement must demonstrate that the defendant exceeded the

21

1   scope of license). It did not. Unless and until Mgame's purported termination is deemed

2   valid, Mgame has no basis to assert a claim for copyright infringement.

3       Further, Mgame's argument that K2's improperly accessed Mgame's servers also

4   presumes that the license was in fact validly terminated. As detailed above, K2 personnel

5   were authorized to access Mgame's servers and, indeed, regularly did so in the ordinary,

6   and necessary, course of operating the Game. All of the actions taken by K2 were

7   necessary to continue the operation of the Game and to avoid the surreptitious attempts by

8   Mgame to prevent K2 from operating the Game pursuant to its rights under the

9   Agreement. Had Mgame not attempted to surreptitiously interfere with K2's exclusive

10  contractual right to distribute and operate the Game, K2 would not have needed to take

11  steps to avoid the numerous electronic "poison pills" introduced into the Game by Mgame

12  in an attempt to wrongfully interfere with K2's contractual rights.

13      Finally, Mgame argues that even if it cannot establish cause to terminate the

14  Agreement (which it cannot), that it nevertheless terminated the Agreement as a matter of

15  right. Mgame misconstrues the Agreement. Article 7, paragraph 1 of the 2011 Extension

16  Agreement specifically provides that "[t]his Agreement and the Prior Agreements shall

17  not be terminated prior to the Expiration Date except due to default in accordance with the

18  Agreement and the Prior Agreements." Book-Larsson Decl., Exh. B. Unless Mgame can

19  establish that K2 is in default (and it cannot), Mgame has no contractual right to terminate

20  the Agreement. Furthermore, Article 7, paragraph 2 of the 2011 Extension Agreement

21  provides that if, for any reason other than default, the Agreement is terminated prior to the

22  "Expiration Date," *in addition* to the remedies available to each party under the law,

23  Mgame must make a termination payment of $180,000 to K2 (reducible by the fraction of

24  months remaining on the Agreement). *Id.* It does not give Mgame the unlimited right to

25  terminate the Agreement at its election.

26      **2.    MGame Cannot Establish a Likelihood of Irreparable Harm.**

27      Mgame cannot establish a likelihood of irreparable harm as a matter of fact or law.

28  As detailed above, this is a money dispute regarding the amount of revenue share

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

payments due to Mgame, if any.  Damages compensable through money cannot provide

the irreparable harm required for the extraordinary remedy of a preliminary injunction.

*Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980).

Legal remedies must be plainly inadequate.  *Id.*  Given that the only damages suffered by

Mgame (the alleged underpayment of revenue sharing payments) can be compensated in

money damages, K2's purported failure to pay revenue share payments allegedly due to

Mgame does not provide a sufficient basis for issuance of a preliminary injunction.

Even if Mgame could demonstrate that its purported termination of the Agreement

was valid (it cannot) and that it could assert a claim for copyright or trademark

infringement, Mgame cannot show a likelihood of irreparable harm.  Irreparable harm is

not presumed in a copyright or trademark infringement case.  "[E]ven in a copyright

infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a

prerequisite for injunctive relief, whether preliminary or permanent."  *Flexible Lifeline

Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) (finding that the

Supreme Court's rulings in *eBay Inc. v. MerchExchange, LLC*, 547 U.S. 388 (2006), and

*Winter, supra*, 555 U.S. 7, overruled earlier circuit court rulings providing for a

presumption of irreparable harm in copyright cases); *accord Perfect 10, Inc. v. Google,

Inc.*, 653 F.3d 976, 981 (9th Cir. 2011); *see also Groupion, LLC v. Groupon, Inc.*, 2011

WL 5913992 (N.D. Cal. Nov. 28, 2011).  K2's continued operation of the Game pending

resolution of this dispute — just as it had done for over the past eight years — will not

cause irreparable injury to Mgame.

Unlike a typical copyright or trademark infringement case, K2 is not a "naked

infringer."  It is, and has been, Mgame's exclusive licensee for over eight years.  K2's

marketing and operations have caused the Game to grow in K2's territories from an

unknown game with zero users to well over fifteen million users — all of whom were

serviced from K2's website, www.gamersfirst.com.  Since 2003, the two companies have

achieved more than $55 million in gross sales in K2's territories as a result of K2's

operation of the Game.  As a result, Mgame has extended K2's license on five separate

23

1    occasions, most recently on June 4, 2011, through December 3, 2012.

2        Currently, K2 continues to operate the Game in the same manner in which it has

3    done successfully for more than eight years.[10]  K2 is simply exercising its rights under the

4    license, while, at the same time, generating significant revenues for Mgame.  This is not a

5    situation where an unrelated third party is infringing the rights of a copyright or trademark

6    owner.  For these reasons, as detailed above, Mgame's reliance on *Goto.com*, *supra*, 202

7    F.3d 1199 is misplaced.  In *Goto.com*, the defendant was a "naked" infringer — it was not

8    operating under a preexisting license from the plaintiff.  Thus, the Court held that the last

9    uncontested status existed before the defendant began using its allegedly infringing logo.

10   Here, the last uncontested status between K2 and Mgame was K2's operation of the Game

11   under the license, just as K2 had done for the over eight years preceding this dispute.

12       Notably, K2 has continued to grow the business even *after* Mgame's wrongful

13   repudiation.  From March 1 through March 20, 2012, the version of the Game operated by

14   K2 had 1.5% <u>more</u> average daily users than the period of October 1, 2011 through January

15   31, 2012.  And, the revenues for the Game <u>increased</u> from average monthly revenues of

16   $412,500 during the period October 1, 2011 through January 31, 2012, to well over

17   $530,000 for the month of March, 2012, representing a 28% increase in revenues.  Mgame

18   will not be irreparably harmed by K2's continued operation of the Game.

19       **3.    The Balance Of Equities Tips In K2's Favor.**

20       For the past eight years, K2 has operated the Game in the exact same manner as it

21   is today.  K2 is entitled to continue operating the Game through December 3, 2012, the

22   end of the license period, unless a Court declares Mgame's purported termination valid.  If

23   a preliminary injunction is granted, K2 will be prohibited from operating the Game and

24   will be forced to turn over all databases and customer information to Mgame.  As a

25   practical matter, it will be extremely difficult, if not impossible, to transfer the operation

26   of the Game back to K2 should K2 prevail in the arbitration.  Issuance of a preliminary

---

[10] Mgame's assertion that it has been irreparably harmed by K2 briefly "altering the rules of the Game" after Mgame's attempts to hijack the Game from K2 are meritless.  As discussed in detail above, revenues from the Game are at an all-time high.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

K2 NETWORK, INC.'S OPPOSITION TO
MGAME'S PRELIMINARY INJUNCTION

1  injunction will effect the early termination of the Agreement Mgame seeks on the merits.

2  It will essentially grant Mgame a permanent injunction under the guise of a provisional

3  remedy. K2 will suffer substantial damages as a result. As the authorized exclusive

4  licensee of Mgame for over eight years, the balance of equities weighs in K2's favor.

5      **4.**    <u>**Injunctive Relief Is Not In The Public Interest.**</u>

6      The public interest is by no means served by granting an injunction that would

7  prohibit a licensee from exercising the rights granted to it solely because a dispute

8  between the parties arose with respect to the amount of royalties due. If a licensor were

9  permitted to seek emergency relief every time such a dispute arose between a licensor and

10  a licensee, the Court systems would be flooded with requests for emergency relief. As a

11  matter of public policy, a party should not be permitted to turn a simple breach of contract

12  claim for money damages into a claim for emergency extraordinary relief.

13      **C.**    <u>**Mgame Has Failed to Tender a Bond.**</u>

14      Rule 65(c) provides that a court may issue a preliminary injunction order "only if

15  the movant gives security in an amount that the court considers proper to pay the costs and

16  damages sustained by any party found to have been wrongfully enjoined or restrained."

17  Should a preliminary injunction issue, K2 will suffer significant damages resulting from

18  the millions of dollars in lost revenue it would have otherwise received. K2 believes that

19  it will lose revenue in an amount not less than $125,000 per week. Book-Larsson Decl.,

20  ¶ 7. Mgame should be required to post a bond sufficient to cover this amount.

21  **IV.**    <u>**CONCLUSION**</u>

22      For each of the foregoing reasons, Mgame's application for a preliminary

23  injunction should be denied in its entirety.

    DATED: April 9, 2012

                                    GREENBERG GLUSKER FIELDS

24                                      CLAMAN & MACHTINGER LLP

25

26                                  By: _____

                                      JULIA R. HAYE

27                                      Attorneys for Defendant K2 Network, Inc., a

                                    California corporation

28

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

                    K2 NETWORK, INC.'S OPPOSITION TO
                    MGAME'S PRELIMINARY INJUNCTION

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Greenberg, Glusker, Fields, Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles, California 90067.

On April 9, 2012, I served the following document **K2 NETWORK, INC.'S OPPOSITION TO MGAME'S APPLICATION FOR PRELIMINARY INJUNCTION** on the interested parties in this action by placing a copy thereof enclosed in a sealed envelopes addressed as follows:

| | |
|---|---|
| Marc Feinstein, Esq.<br>Ivana Cingel, Esq.<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071-2899 | Attorneys for Plaintiff Mgame Corporation<br><br>T: (213) 430-6000<br>F: (213) 430-6407<br>E: mfeinstein@omm.com<br>   icingel@omm.com |
| Steven L. Smith, Esq.<br>Benjamin Jones, Esq.<br>O'Melveny & Myers LLP<br>Two Embarcadero Center, 28th Floor<br>San Francisco, CA 94111-3823 | E: ssmith@omm.com<br>   bjones@omm.com |

__XX__   (BY MAIL) By placing the document(s) listed above in sealed envelope(s) in a designated "OUT" box in the office of my employer. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid. (CCP Section 1013a, 2015.5, FRCP section 5(B), or FRAP 25(d).

__    (BY CERTIFIED MAIL/RETURN RECEIPT) By placing the document(s) listed above in sealed envelope(s) with two copies of the Notice of Acknowledgment of Receipt and a postage-paid return envelope addressed to me in a designated "OUT" box in the office of my employer . I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the United States Postal Service on that same day with postage thereon fully prepaid. (CCP Section 1013a, 2015.5, FRCP section 5(B), or FRAP 25(d).

__    (BY FACSIMILE) Per prior agreement [or order of the Court] by transmitting via facsimile from this office's facsimile transmission telephone number the document(s) listed above to a facsimile machine maintained by the person or persons indicated at the facsimile number(s) as last given by that person or persons on any document which he or she has filed in the matter and served on this office. Said transmission was reported as complete and without error and a copy of that report with the facsimile telephone number to which transmittal was made and date

GREENBERG GLUSKER FIELDS CLAMAN<br>& MACHTINGER LLP<br>1900 Avenue of the Stars, 21st Floor<br>Los Angeles, California 90067-4590

and time completed is attached to this proof of service. (CCP Sections 1013(e), 2015.5.)

___ (BY FEDERAL EXPRESS) By placing a copy of the document(s) listed above in a sealed envelope and sending it via Federal Express, with delivery fees provided for, addressed to the person indicated at that person's last office address as shown on a recent document filed in the cause and served on this office by that person(s). I know that in the ordinary course of business at this office said document(s) will be deposited in a box or other facility regularly maintained by Federal Express or delivered to an authorized courier or driver of Federal Express for next day delivery. (CCP Sections 1013(c), 2015.5)

___ (BY HAND DELIVERY) I caused for such envelope(s) to be delivered by hand to addressee(s).

_XX_ (BY E-MAIL) I e-mailed a true and correct copy of the foregoing document to the addressees at the e-mail addresses set forth above. Each e-mail was complete and no reports of error were received.

___ (BY CM/ECF) The document(s) listed above were also served on _____ by electronic service by electronically filing said documents with the U.S. District Court, Central District of California Case Management/Electronic Case Filing (CM/ECF) system. Upon completion of transmission of said documents, a Notice of Electronic Filing (NEF) was issued to the filing party acknowledging receipt of said documents by the CM/ECF system and that notice had been electronically mailed to all parties.

_X_ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on April 9, 2012, at Los Angeles, California.


_____          _____
      NANCY L. LUIS                              Signature

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590